OPINION
{¶ 1} Defendant-appellant Layton Roberts appeals his convictions for rape and gross sexual imposition. The victim of both offenses was Roberts's stepdaughter, who was eight years old at the time of the first offense.
 {¶ 2} Roberts has assigned six errors on appeal. Roberts challenges the sufficiency and weight of the evidence upon which his convictions were based, and the trial court's denial of his Crim.R. 29 motions for judgments of acquittal. Roberts also argues that the trial court erred by failing to instruct the jury on a lesser-included offense, by imposing prison terms that exceeded the statutory minimum, and by adjudicating him a sexual predator. For the reasons that follow, we affirm the trial court's judgment.
 Evidence of the Rape Offense {¶ 3} At the time of the trial in this case, the victim was ten years old. The victim testified that when she was eight years old, she lived in an apartment with her mother and her stepfather, Roberts. One day while her mother was washing dishes, the victim and Roberts were in the victim's upstairs bedroom watching a movie. At one point, Roberts told the victim to shut the bedroom door because her mother was making too much noise.
 {¶ 4} Roberts and the victim were lying on the victim's bed when Roberts began to fondle her. The victim testified, "And then he started rubbing my vagina inside really hard, and it hurt."
 {¶ 5} Then the following exchange took place between the prosecutor and the victim:
 {¶ 6} "Q. Now, when you say he was rubbing, was he using his hand again, or was he using something else?
 {¶ 7} "A. His hand.
 {¶ 8} "Q. And do you remember, were you wearing any clothing on this incident?
 {¶ 9} "A. That I remember, yes.
 {¶ 10} "Q. And do you remember if you were wearing underwear?
 {¶ 11} "A. Yes.
 {¶ 12} "Q. And was he rubbing on top of your underwear or underneath your underwear?
 {¶ 13} "A. Underneath.
 {¶ 14} "Q. Now, on this incident, you said that he was rubbing your vagina hard and that he rubbed it on the inside?
 {¶ 15} "A. Yes.
 {¶ 16} "Q. Can you tell me what you mean by that?
 {¶ 17} "A. I don't really know how to explain it.
 {¶ 18} "Q. Okay. Do you recall if he was using his whole hand to rub you or did he use just one or two fingers to rub you?
 {¶ 19} "A. I don't remember.
 {¶ 20} "Q. Okay. How do you know * * * that he was rubbing you on the inside of your vagina?
 {¶ 21} "A. Because I felt it and it hurt.
 {¶ 22} "Q. Okay. I know this is uncomfortable for you, but I have to have everybody understand what happened. Okay? So if you don't mind, I'm going to come up here a little bit closer to you, and if we can, just use my hand to demonstrate. Okay? And if this is your vagina, right here, okay, where was he rubbing you on your vagina? Can you demonstrate?
 {¶ 23} "A. Here (indicating).
 {¶ 24} "Q. So you're putting your finger in between my fingers. Okay. And what happened after that?
 {¶ 25} "A. I don't remember anything else.
 {¶ 26} "Q. That's what you remember happening?
 {¶ 27} "A. Yes.
 {¶ 28} "Q. And how did this end, this incident?
 {¶ 29} "A. I think that my mom told him to like get out of my room, and she talked to him about something."
 {¶ 30} The victim's mother, Betty Michelle Garrett Roberts, testified that she remembered the day of the incident because she had told Roberts and the victim to leave the bedroom door open while they watched the movie. Mrs. Roberts testified, "And before I knew it, the door was shut. And I kept trying to make voice contact back and forth with, `What's going on,' and this and that with them, but obviously with the door shut, you know, I couldn't be heard, and I would go and open the door up. I went and opened the door."
 {¶ 31} "I observed them both under the covers. And [Roberts] had his arm, you know, like there on the bed. * * * Lying on his back, on the bed (indicating). * * * I said, `That doesn't look right. You shouldn't be in there. And you should come out. If you want to watch the movie, come out.'"
 {¶ 32} The victim did not immediately tell her mother what had happened in the bedroom. Mrs. Roberts testified that on a later date she had gone to pick the victim up from Mrs. Roberts's mother's home, and that her mother, Iva Norris, told her that the victim had been unusually withdrawn that day.
 {¶ 33} When Mrs. Roberts spoke to the victim, the victim told her that she did not want to go home. The victim told her that Roberts had touched her "privates," and that "[h]e rubbed me really, really hard." As the victim spoke, Mrs. Roberts testified, "she pointed to her vagina."
 {¶ 34} Mrs. Roberts left her daughter at her mother's home and went to her apartment to confront Roberts. She told Roberts to leave the home, but Roberts said that he did not have anyplace to go. When Mrs. Roberts asked him about what had happened with the victim, Roberts said, "Well, maybe I was tickling her and I accidentally touched her."
 {¶ 35} Roberts moved out of the apartment for a few weeks. In the meantime, Mrs. Roberts spoke to her daughter and told her that she would have to be examined. Mrs. Roberts testified, "I scared her because I told her what would happen. And I shouldn't have told her. I should have let it been a surprise. And she told me that she couldn't do that, that she was too afraid, and that she would say that it didn't happen or that it was a dream."
 {¶ 36} Mrs. Roberts allowed Roberts to move back into the home because she was pregnant with his son, with the condition that Roberts would never be alone with the victim. Mrs. Roberts testified that she had spoken to the victim about Roberts's return, and "we said, well, since I'm pregnant with [his baby], we'll give him a second chance, because I didn't know to the extent it had went." So Mrs. Roberts arranged for her mother, Norris, to pick the victim up from school and to stay with her until Mrs. Roberts got home from work. Mrs. Roberts told Norris that Roberts was never to be alone with the victim.
 {¶ 37} The following school year, the victim told a friend at school that her stepfather had tried to kiss her. The friend relayed the story to a teacher, who then reported it to the school counselor. When the counselor spoke to the victim, the victim said that the incident had only been a dream. At trial, when asked why she had described the incident as a dream, the victim testified, "[B]ecause my mom had told me what would happen, and I guess I was afraid."
 {¶ 38} After receiving a telephone call from the school principal, Mrs. Roberts and Roberts spoke with the school counselor. Roberts told the counselor that he thought that the victim was jealous of her baby brother. The counselor recommended that the Roberts family seek counseling to discuss the addition of a stepparent to the family.
 Evidence of Gross Sexual Imposition {¶ 39} The victim testified that she was ten years old at the time of the gross sexual imposition. In January 2004, the victim lived in a house with her mother, her one-year-old brother, and Roberts. One day, the victim's grandmother, Norris, brought her home from school, and Roberts was there.
 {¶ 40} At that time, Roberts told the victim that he wanted to watch a movie with her upstairs because he did not feel comfortable watching the movie with her grandmother. The victim went into her bedroom and selected a movie. The victim lay on her bed, underneath the covers, and Roberts asked whether he could get underneath the covers with her. When the victim did not respond, Roberts got into the bed underneath the covers.
 {¶ 41} The victim was wearing a t-shirt, pants, a sports bra, and underwear. Roberts began to rub the outside of the victim's thigh with his hand. Roberts asked the victim whether she would take off her pants, but she refused. Roberts told her that the pants "didn't feel right to his hand." So the victim changed into a nightgown and got back into bed.
 {¶ 42} Then, the victim testified, "[Roberts] started rubbing my butt, my boobs, my vagina." The victim stated that Roberts rubbed her body both on top of the clothing, as well as underneath the nightgown and sports bra, on her skin. The victim testified that Roberts also rubbed her on top of her underwear.
 {¶ 43} Roberts told the victim that he loved some people, that he loved her differently, and that he wanted to rub her all over. While he was touching her, Roberts told the victim to shut the door. After shutting the door, the victim got back into the bed.
 {¶ 44} Norris testified that she became anxious so she yelled up the stairs, "That movie has to be over." And the victim yelled back, "We'll be down in a little bit." Norris became more anxious because she "knew something was going on and [she] didn't know what it was, but [she] knew something was going on and it wasn't no good."
 {¶ 45} So Norris went upstairs and pulled the bedroom door open. Norris saw Roberts lying on the bed with the victim. Roberts was on his back with his hands behind his head. Norris testified that the victim was wearing a top and underwear, and that the victim "jumped up and put her arms across her legs, like this, and looked just pathetic, you know." Norris testified that she knew the victim was scared because "she had that look on her face, frightened, and she turned real pale."
 {¶ 46} Norris went back downstairs and wrote a note to her daughter, the victim's mother, telling her what had happened. Norris did not confront Roberts because "he was a big man; you know, it was his house, and I didn't want to get in trouble there; I didn't want to get hurt or get [the victim] hurt." Norris waited for her daughter to come home from work.
 {¶ 47} Norris testified that the victim had come back downstairs and was trying to do her math homework. Norris said that the victim, an honor-roll student, was so nervous that she was having trouble with the work.
 {¶ 48} When Mrs. Roberts got home from work, Norris met her on the porch and slipped the note into her pocket. Norris told her daughter to read the note later "in privacy."
 {¶ 49} When the two women walked into the house, Roberts was sitting on the couch, looking "really, really flushed." The victim was sitting at the dining-room table doing her homework. Mrs. Roberts began to ask the victim what was wrong, when the victim screamed, "Nothing. I told you nothing happened. I told Grandma nothing happened." Mrs. Roberts told her, "It's all right, * * *. Nobody said anything."
 {¶ 50} Mrs. Roberts said that she could tell that something was wrong with her daughter. She testified that her daughter was a straight-A student, but that "[s]he was doing her multiplication tables by adding them. And she was doing it upside down; she was a wreck." Mrs. Roberts tried to calm the victim by going about a normal evening routine. Within the hour, Mrs. Roberts went upstairs into the bathroom to read her mother's note.
 {¶ 51} Later that evening, the victim went upstairs to bathe. She yelled downstairs to her mother, asking her to cut her toenails. Mrs. Roberts went upstairs and got nail clippers. When Mrs. Roberts bent down to clip the victim's nails, she noticed that the nails did not need to be trimmed. Mrs. Roberts testified, "She didn't need a toenail trim; she wanted to talk to me. * * * [S]he said, `Mommy, I need to tell you something, but don't be mad at me.'"
 {¶ 52} The victim told her mother that Roberts had rubbed her in places that he should not have. Mrs. Roberts told her not to worry because she would take care of it. That evening, when near her husband, Mrs. Roberts pretended that "everything was normal and that it was just another day."
 {¶ 53} The next morning, Mrs. Roberts got out of bed and pretended to get ready for work. Once Roberts left for work, Mrs. Roberts called her boss to tell him that she would not be at work. Mrs. Roberts drove her son to his babysitter's home and asked the sitter for advice. The sitter told her to call the county family-services agency.
 {¶ 54} Mrs. Roberts was instructed to take the victim to Children's Hospital for an examination. At the hospital, a sex-abuse investigator from the family-services agency interviewed the victim about the incident and then made a referral to the police for further investigation.
 Weight and Sufficiency of the Evidence {¶ 55} In his first, second, and third assignments of error, Roberts challenges the weight and sufficiency of the evidence upon which his rape and gross-sexual-imposition convictions were based, as well as the trial court's denial of his Crim.R. 29 motions for acquittal.
 {¶ 56} In reviewing a challenge to the weight of the evidence, we sit as a "thirteenth juror."[1] We must review the entire record, weigh the evidence, consider the credibility of the witnesses, and determine whether the trier of fact clearly lost its way and created a manifest miscarriage of justice.[2] A new trial should be granted only in exceptional cases where the evidence weighs heavily against conviction.[3] To determine whether a trial court has erred in overruling a Crim.R. 29 motion for acquittal, the question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found all the essential elements of the crime beyond a reasonable doubt.[4] We make the same inquiry in reviewing the sufficiency of the evidence.[5]
 {¶ 57} To support his conviction for rape as charged in the indictment, the jury had to find that Roberts had engaged in sexual conduct with a person who was less than 13 years old and not his spouse.[6] "Sexual conduct" is defined to include "the insertion, however slight, of any part of the body * * * into the vaginal or anal cavity of another." (Emphasis added.)[7]
 {¶ 58} In State v. Wells,[8] the Ohio Supreme Court addressed the question of the legislature's intent in using the phrase "anal cavity" in the sexual-conduct definition. The court looked to the common, everyday meaning of "cavity," which is "a natural hollow place within the body."[9] The court concluded that the term "anal cavity" referred to the lower portion of the alimentary canal and not to the buttocks. So, the court held, a conviction for anal rape under R.C. 2907.02
required proof of penetration of the victim's anus; proof of contact made with the victim's buttocks would not be enough.[10]
 {¶ 59} Roberts argues that, like the anal cavity, "the vaginal cavity is also within the body, and penetration between the labia is not penetration of the vaginal cavity." Roberts claims that the victim's courtroom demonstration indicated only the insertion of fingers "between the labia" and not into the vaginal cavity. So, Roberts argues, based upon the court's reasoning in Wells, there was insufficient proof of penetration.
 {¶ 60} But on this record, we cannot say what the victim's courtroom demonstration indicated. The record shows only that the prosecutor used her hand for the demonstration and stated to the victim, "And if this is your vagina, right here, okay, where was he rubbing you on your vagina? Can you demonstrate?" In response, the victim stated, "Here (indicating)." And the prosecutor attempted to clarify for the record the victim's action by stating, "So you're putting your finger in between my fingers. Okay."
 {¶ 61} We recognize that the prosecutor was in the difficult position of having a child witness testify about her vagina, and of trying to relate that testimony to the jury by way of a demonstration. But the record before us simply does not reflect what the demonstration showed. We do not know the positioning of the prosecutor's hand or fingers, or the placement by the victim of her finger in relation to the prosecutor's fingers. Roberts's assertion that the victim's demonstration indicated only that his fingers were "between the labia" is mere speculation.
 {¶ 62} Even if Roberts is correct that the victim's demonstration and testimony indicated penetration solely of the labia, courts have consistently held that such testimony is sufficient evidence of vaginal penetration.[11] For example, in State v. Lucas,[12] the Second Appellate District applied the rationale of Wells to vaginal rape. The court held that evidence that "the force of the object caused the outer lips of the victim's vagina, the labia, to spread" was sufficient to prove vaginal penetration.[13] The court further held that the evidence would be "insufficient to prove sexual conduct and vaginal rape as a result if the evidence shows only that the defendant made contact with the labia and no spreading occurred."[14] Recently, the Tenth Appellate District sustained a rape conviction upon a victim's testimony that the defendant had inserted his fingers inside the lips of her vagina.[15] So even if the victim's courtroom demonstration showed only the penetration of the victim's labia, as Roberts speculates, the jury reasonably could have inferred that vaginal penetration had occurred.
 {¶ 63} During the jury's deliberations in this case, the jury submitted a question to the trial court: "Where is the actual point at which the vaginal cavity begins?" The court declined to give a specific definition and told the jury that it must rely solely upon the evidence that had been presented. Similarly, inState v. Fulkerson,[16] the jury posed to the trial court the question whether a finger in the folds of the labia was considered penetration. In that case, the trial court responded, "Slight penetration entering the labia is sufficient to complete vaginal intercourse."[17] On appeal, the Eighth Appellate District found no error in the trial court's supplemental instruction and sustained a rape conviction based upon the victim's testimony that the defendant's thumb was approximately one-half inch inside her vagina.[18]
 {¶ 64} In this case, even without the courtroom demonstration by the victim, her testimony alone, if believed, was sufficient to prove each element of the offense of rape.[19] The victim testified that Roberts "started rubbing my vagina inside really hard, and it hurt." When asked how she knew that Roberts was rubbing her "on the inside of [her] vagina," the victim responded, "Because I felt it and it hurt." A rape victim's testimony that an offender inserted his finger inside her vagina is sufficient evidence of penetration.[20]
 {¶ 65} Certainly, Ohio courts have found less precise testimony of vaginal penetration to be sufficient evidence of sexual conduct to support a rape conviction. For example, this court has sustained a rape conviction based upon a child's testimony that an offender inserted his finger into her "private part."[21] This court has also held that sufficient evidence of vaginal penetration was presented where an eight-year-old girl testified that her father "tried to stick his up mine" and that "he was trying but it wouldn't go in."[22]
 {¶ 66} Other Ohio courts have held that a child's testimony supported a reasonable inference of vaginal penetration where the child testified about an offender's penetration of her "crotch,"[23] or her "private,"[24] or where a child testified that the offender did not "penetrate" her vagina "all the way," but that he had placed his penis "in" her and "inside" her.[25] So here the victim's testimony that Roberts rubbed her "vagina inside" was sufficient proof of vaginal penetration.
 {¶ 67} Roberts also argues that because there was no evidence of damage to the victim's hymen, there was insufficient evidence to justify an inference that the victim's vaginal cavity had been penetrated. But courts have routinely rejected such an argument. A victim's testimony concerning vaginal penetration need not be corroborated.[26] And no medical evidence of hymenal damage is required to prove penetration.[27]
 {¶ 68} Accordingly, we hold that the victim's testimony with respect to vaginal penetration was sufficient, as a matter of law, for a jury to reasonably conclude that Roberts had engaged in sexual conduct. After reviewing the evidence in the light most favorable to the prosecution, we are convinced that a rational trier of fact could have concluded that the elements of rape had been established. Moreover, we cannot say that the jury lost its way in finding Roberts guilty of rape.
 {¶ 69} With respect to Roberts's conviction for gross sexual imposition, the jury was required to find that he had sexual contact with a person less than 13 years old and not his spouse.[28] Sexual contact is defined as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person."[29] "Whether touching is done for the purpose of sexual gratification is a `question of fact to be inferred from the type, nature, and circumstances surrounding the contact.'"[30]
 {¶ 70} Our review of the record convinces us that the victim's testimony, if believed, was sufficient to convict Roberts of gross sexual imposition. The victim testified that Roberts had rubbed her breasts, thigh, buttocks, and vaginal area while he told her that he wanted to rub her all over and that he loved her differently than he loved other people. Roberts ensured that the two would be alone, underneath the bed covers, with the bedroom door closed. From Roberts's words, actions, and attempts at secrecy, the jury could have reasonably concluded that Roberts had touched the victim's erogenous zones for the purpose of his own sexual gratification. The conviction for gross sexual imposition was, therefore, based upon sufficient evidence. And we are convinced that the jury did not lose its way in finding Roberts guilty of gross sexual imposition. We overrule Roberts's first, second, and third assignments of error.
 Jury Instructions {¶ 71} In his fourth assignment of error, Roberts argues that, with respect to the rape offense, the trial court erred by refusing to instruct the jury on the lesser-included offenses of attempted rape and gross sexual imposition. Specifically, he contends that he was entitled to an instruction on gross sexual imposition because the evidence of vaginal penetration was insufficient. We note that Roberts failed to request an attempted-rape instruction at trial, so he has waived all but plain error as to that instruction.[31]
 {¶ 72} Gross sexual imposition, as defined in R.C.2907.05(A)(4), is a lesser-included offense of rape, as defined in R.C. 2907.01(A)(1).[32] Attempted rape is also a lesser-included offense of rape.[33] Even so, Roberts was not entitled to instructions on either unless the evidence warranted the instructions.[34] A charge on a lesser-included offense is required only where the evidence presented at trial would reasonably support both an acquittal on the crime charged and a conviction upon the lesser-included offense.[35]
 {¶ 73} Rape requires "sexual conduct," whereas gross sexual imposition requires "sexual contact."[36] Here, Roberts was charged with raping his stepdaughter vaginally, so to find that he had engaged in that type of sexual conduct, the jury had to find that he had inserted an object or body part, in this case his finger, into her vaginal cavity.[37] Gross sexual imposition, on the other hand, requires no finding of penetration — the jury would have had to find only that Roberts had touched an "erogenous zone."[38]
 {¶ 74} Here, the victim's description of Roberts's actions could not have supported both an acquittal of rape and a conviction on the lesser-included offense of gross sexual imposition or attempted rape. The jury could not have inferred anything less than penetration from the victim's testimony that Roberts had inserted his finger into her vagina and that he had "started rubbing [her] vagina inside really hard, and it hurt."[39] Therefore, we hold that the trial court did not err by refusing to give the instructions on the lesser-included offenses of gross sexual imposition and attempted rape, because neither instruction was warranted by the evidence. The evidence did not support a conviction on a lesser-included offense. We overrule the fourth assignment of error.
 Sentencing Issues {¶ 75} In his fifth assignment of error, Roberts argues that the trial court erred by imposing prison terms longer than the minimum terms allowed by law for the offenses. For the rape, Roberts faced a definite prison term from the range of three to ten years.[40] For the gross sexual imposition, Roberts faced a definite prison term from the range of one to five years.[41] The court did not impose the minimum or the maximum prison term for either offense. Instead, the court imposed an eight-year prison term for the rape, and a four-year term for the gross sexual imposition.
 {¶ 76} R.C. 2929.14(B) requires a trial court to impose the shortest prison term authorized for the offense, "unless one or more of the following applies:
 {¶ 77} "(1) The offender was serving a prison term at the time of the offense, or the offender previously had served a prison term.
 {¶ 78} "(2) The court finds on the record that the shortest prison term will demean the seriousness of the offender's conduct or will not adequately protect the public from future crime by the offender or others."
 {¶ 79} In State v. Montgomery,[42] we held that a sentencing court must impose the shortest prison term on an offender who has not previously served a prison term unless the court makes one of the findings under R.C. 2929.14(B)(2). Roberts argues that Montgomery mandates modification of his sentences to the minimum terms. But Montgomery applies only to first-time offenders.[43] A trial court is not bound by the shortest-term requirement if an offender has previously served a prison term.[44]
 {¶ 80} Here, there is no dispute that Roberts had served a prior prison term in Iowa for felony sexual abuse. Roberts had served two years of a ten-year prison sentence for the rape of his then-wife. So the trial court was not constrained to impose minimum prison terms, and the court's sentence was not contrary to law. Accordingly, we overrule the fifth assignment of error.
 Sexual-Predator Adjudication {¶ 81} In his sixth assignment of error, Roberts argues that R.C. Chapter 2950 violates various provisions of the United States and Ohio constitutions. We overrule Roberts's constitutional challenges on the authority of State v.Williams[45] and State v. Cook.[46]
 {¶ 82} Roberts also argues that the trial court erred by designating him a sexual predator. To obtain a sexual-predator adjudication, the state must prove by clear and convincing evidence that the offender has been convicted of a sexually-oriented offense, and that the offender is likely to engage in the future in one or more sexually-oriented offenses.[47] In making the determination whether an offender is likely to commit future sexually-oriented offenses, the court is required to consider all relevant factors, including those enumerated in R.C. 2950.09(B)(2).[48]
 {¶ 83} The record reveals that the trial court conducted a thorough review of the evidence which included two reports from the court clinic and statements from an arresting officer, the victim's mother, and a case worker from the county family-services agency. The court noted that Roberts had engaged in a pattern of abuse with his stepdaughter who was only eight years old at the time of the rape offense.
 {¶ 84} The court considered Roberts's prior felony sex-abuse conviction stemming from the rape of his former wife. A report from the court clinic related Roberts's description of the offense: "[W]e were having marital problems [* * *] she had an affair [* * *] I got mad one night [* * *] I pushed her down in the living room of our house [* * *] forced her down and raped her." The clinic report noted that Roberts had completed a sex-offender treatment program while imprisoned in Iowa. A 1996 psychological evaluation from the Iowa prison concluded that Roberts "continues to have cognitive distortions, is immature about his sexual deviance, is dishonest about his interest in his sexual deviance. * * * [O]ne can only surmise that he has reached little or at least minimal insights concerning his sexual deviance."
 {¶ 85} The clinic report further noted that Roberts had stated that his parenting rights for two children from his first marriage were terminated because he had allegedly physically and sexually abused them. Roberts reported that the investigation had substantiated an allegation that he had fondled his daughter, but he denied having done so.
 {¶ 86} Although Roberts scored only in the "low" risk category in a test designed to evaluate the likelihood of committing future sexually-oriented offenses, the clinic psychologist opined that the score "under-represent[ed] his risk at this time," based upon his prior rape conviction and the prior sexual-molestation investigation.
 {¶ 87} Based on these facts, we conclude that the record contains clear and convincing evidence that Roberts is likely to re-offend. Accordingly, we overrule the sixth assignment of error and affirm the trial court's judgment.
Judgment affirmed.
Doan, P.J., and Gorman, J., concur.
[1] See State v. Thompkins (1997), 78 Ohio St.3d 380, 387,1997-Ohio-52, 678 N.E.2d 652.
[2] Id.
[3] Id.
[4] See State v. Bridgeman (1978), 55 Ohio St.2d 261,381 N.E.2d 184, syllabus.
[5] See State v. Jenks (1991), 61 Ohio St.3d 259,574 N.E.2d 492, paragraph two of the syllabus; State v. Thompson (1998),127 Ohio App.3d 511, 525, 713 N.E.2d 456.
[6] See R.C. 2907.02(A)(1)(b).
[7] R.C. 2907.01(A).
[8] 91 Ohio St.3d 32, 2001-Ohio-3, 2001-Ohio 227,740 N.E.2d 1097.
[9] Id., citing Webster's New World Dictionary (3 Ed. 1991) 224 (emphasis sic).
[10] Id.
[11] See State v. Grant, 2nd Dist. No. 19824, 2003-Ohio-7240
(sufficient evidence of rape where defendant inserted his finger one-half inch between the victim's external labia); State v.Childers (Dec. 19, 1996), 10th Dist. No. 96APA05-640-640 ("entry of the anterior of the female genital organ, known as the vulva or labia, is sufficient penetration to constitute rape"); Statev. Ulis (July 22, 1994), 6th Dist. No. L-93-247 (entry of the vulva is sufficient proof of vaginal penetration); see, also,State v. Falkenstein, 8th Dist. No. 83316, 2004-Ohio-2561;State v. Blankenship (Dec. 13, 2001), 8th Dist. No. 77900;State v. Nivens (May 28, 1996), 10th Dist. No. 95 APA09-1236;State v. Carpenter (1989), 60 Ohio App.3d 104,573 N.E.2d 1206.
[12] 2nd Dist. No. 18644, 2001-Ohio-1350.
[13] Id.
[14] See, also, Grant, supra.
[15] See State v. Gilbert, 10th Dist. No. 04AP-933, 2005-Ohio-5536.
[16] 8th Dist. No. 83566, 2004-Ohio-3114.
[17] Id. at ¶ 21.
[18] Id.
[19] See State v. Lewis (1990), 70 Ohio App.3d 624, 638,591 N.E.2d 854; State v. Reinhardt, 10th Dist. No. 04AP-116,2004-Ohio-6443, at ¶ 29.
[20] See State v. Lucas, supra.
[21] See State v. Denkins, 1st Dist. No. C-030518,2004-Ohio-1696.
[22] See State v. Gray (Dec. 11, 1998), 1st Dist. No. C-970933.
[23] See State v. Bowers, 2nd Dist. No. 2001-CA-20, 2001-Ohio-1444.
[24] See State v. Parsons, 2nd Dist. No. 20476,2005-Ohio-2017.
[25] See In re Fisher (June 25, 1998), 10th Dist. Nos. 97APF10-1356 and 97APF11-1552.
[26] State v. Gingell (1982), 7 Ohio App.3d 364,455 N.E.2d 1066.
[27] See State v. Blankenship, supra; State v. Nivens,
supra; State v. Shoop (1993), 87 Ohio App.3d 462,662 N.E.2d 665; State v. Carpenter, supra; State v. Harder (Oct. 9, 1984), 3rd Dist. No. 9-83-26, quoting Annotation, What Constitutes Penetration in Prosecution for Rape or Statutory Rape (1971), 76 A.L.R.3d 163, 171.
[28] R.C. 2907.05(A)(4).
[29] R.C. 2907.01(B).
[30] State v. Daniels, 1st Dist. No. C-020321, 2003-Ohio-1545, at ¶ 10, citing In re Anderson (1996),116 Ohio App.3d 441, 443-444, 688 N.E.2d 545; State v. Mundy (1994),99 Ohio App.3d 275, 289, 650 N.E.2d 502.
[31] See Crim.R. 30(A); State v. Williams (1977),51 Ohio St.2d 112, 364 N.E.2d 1364, paragraph one of the syllabus.
[32] See State v. Lynch, 98 Ohio St.3d 514, 2003-Ohio-2284,787 N.E.2d 1185; State v. Johnson (1988), 36 Ohio St.3d 224,522 N.E.2d 1002, paragraph one of the syllabus.
[33] See State v. Leonard, 104 Ohio St.3d 54, 2004-Ohio-6235,828 N.E.2d 229, at ¶ 116.
[34] See State v. Thomas (1988), 40 Ohio St.3d 213,533 N.E.2d 286, paragraph two of the syllabus.
[35] Id.
[36] R.C. 2907.01(A)(1)(b) and 2907.05(A)(4).
[37] See R.C. 2907.01(A).
[38] See R.C. 2907.01(B).
[39] See Gray, supra.
[40] R.C. 2929.14(A)(1).
[41] R.C. 2929.14(A)(3).
[42] 159 Ohio App.3d 752, 2005-Ohio-1018, 825 N.E.2d 138, discretionary appeal allowed, 106 Ohio St.3d 1410,2005-Ohio-3154, 830 N.E.2d 344, certification granted,106 Ohio St.3d 1408, 2005-Ohio-3154, 830 N.E.2d 342.
[43] See id. at ¶ 10.
[44] R.C. 2929.14(B)(1).
[45] 88 Ohio St.3d 513, 2000-Ohio-428, 728 N.E.2d 342, certiorari denied sub nom. Suffecool v. Ohio (2000),531 U.S. 902, 121 S.Ct. 241.
[46] 83 Ohio St.3d 404, 1998-Ohio-291, 700 N.E.2d 570, certiorari denied sub nom. Cook v. Ohio (1999), 525 U.S. 1182,199 S.Ct. 1122.
[47] R.C. 2950.01(E)(1); State v. Eppinger,91 Ohio St.3d 159, 162, 2001-Ohio-247, 743 N.E.2d 881.
[48] See Eppinger, supra, at 166, 2001-Ohio-247,743 N.E.2d 881.