[Cite as *In re C.A.*, 2015-Ohio-4768.]

# Court of Appeals of Ohio

## EIGHTH APPELLATE DISTRICT
## COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 102675**

# IN RE: C.A.

## JUDGMENT:
## AFFIRMED IN PART AND
## REMANDED IN PART

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Juvenile Division
Case No. DL13-114173

**BEFORE:** E.A. Gallagher, J., Jones, P.J., and Laster Mays, J.

**RELEASED AND JOURNALIZED:** November 19, 2015

**ATTORNEY FOR APPELLANT**

Judith M. Kowalski
333 Babbitt Road, Suite 323
Euclid, Ohio 44123

**GUARDIAN AD LITEM**

Amy K. Habinski
Habinski Law Offices LLC
11470 Euclid Avenue
Suite 342
Cleveland, Ohio 44106


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor
BY: Joanna N. López
        Scott Zarzycki
Assistant Prosecuting Attorneys
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

EILEEN A. GALLAGHER, J.:

**{¶1}** Defendant-appellant C.A. appeals from an order of the Cuyahoga County Court of Common Pleas Juvenile Division ("juvenile court") adjudicating him delinquent by reason of rape. He contends that his delinquency adjudication was not supported by sufficient evidence and was against the manifest weight of the evidence. He also contends that the juvenile court erred in denying him access to Cuyahoga County Division of Children and Family Services ("CCDCFS") records relating to the incident and in allowing the sexual assault nurse examiner who examined the alleged victim following the incident to testify regarding statements the alleged victim had made regarding the incident. For the reasons that follow, we affirm the juvenile court judgment in part and remand the matter for further proceedings.

**Factual and Procedural Background**

**{¶2}** On September 30, 2013, the state of Ohio filed a delinquency complaint against C.A., age 14, alleging that he had raped M.M., age 10, in violation of R.C. 2907.02(A)(1)(b). The allegations related to an incident in which C.A. allegedly forced M.M. to perform oral sex while the two children were playing a game of hide-and-seek. C.A. denied the allegations of the complaint.

**{¶3}** In October 2013, C.A. served a subpoena duces tecum on CCDCFS requesting "all CCDCFS records involving the alleged sexual abuse of [M.M.] by [C.A.]." CCDCFS filed a motion to quash the subpoena or for a protective order and in

camera inspection, arguing that the subpoena was not timely served and sought confidential information related to the reporting and investigation of child abuse that was not subject to disclosure pursuant to R.C. 2151.421(H)(1)-(2) and 5153.17.

{¶4} At a pretrial conference on November 4, 2013, the juvenile court noted that CCDCFS had moved to quash the subpoena but that "[n]o documents" had yet "been received by the court under seal to address the motion." The court, therefore, "held in abeyance" its ruling on the motion.

{¶5} An adjudicatory hearing was held on April 15, 2014 and May 15, 2014. Before the hearing began, defense counsel raised the issue of his outstanding request for CCDCFS records relating to the incident. Defense counsel argued that the records were relevant to C.A.'s defense because they could contain exculpatory material or inconsistent statements by the alleged victim, M.M. Defense counsel asserted that the police report from the incident indicated that M.M.'s counselor had told police that M.M. had made inconsistent statements regarding the incident and that based on other information obtained in discovery, he had "good reason" to believe that M.M. had made a statement to CCDCFS relating to the incident. He further argued that "it would stand to reason" that if M.M. had made inconsistent statements to one person or persons, "possibly she's made other inconsistent statements."[1] Defense counsel maintained that access to this information was particularly important in this case because there was no DNA evidence,

---

[1] Defense counsel indicated that although the CCDCFS records might also contain information regarding other incidents involving M.M., C.A. was not seeking that information.

no independent witnesses to the incident and no confession; as such, the case rested entirely on the credibility of M.M.

{¶6} Defense counsel further argued that even if M.M.'s statements to CCDCFS were not admissible as substantive evidence, they could still be used to impeach M.M.'s testimony and that C.A. "should have the right to present that evidence if necessary." He, therefore, requested that the juvenile court conduct an in camera review of the CCDCFS records responsive to the subpoena to determine whether they contained any information that would be "helpful to [the] defense" and, if so, whether C.A.'s right to due process and a fair trial outweighed the need to maintain the confidentiality of the records.

{¶7} In response, the state argued that defense counsel had no need for the confidential records because it had other ways to impeach M.M.'s testimony, including the police report and medical records. The state maintained that it was "a bit presumptuous to have the CCDCFS records reviewed at this point" because there was nothing to suggest that "once you do the balancing, the confidentiality is going to be outweighed by anything that would be for the purposes of impeachment."

{¶8} Although the juvenile court indicated that the CCDCFS records had "arrived through the [c]ourt under seal,"[2] the court granted CCDCFS's motion to quash without conducting an in camera review of the records. The juvenile court did not explain the rationale for its ruling.

---

[2]The CCDCFS records are not part of the record on appeal.

**{¶9}** At the adjudicatory hearing, the state presented testimony from five witnesses: M.M., Z.M. (M.M.'s mother), Lena Oates (M.M.'s former counselor at Beech Brook), Stephanie Grossman (the sexual assault nurse examiner who examined M.M. at the emergency room following the incident), and Yashila Crowell (the East Cleveland detective who investigated the incident). A summary of their testimony follows.

**{¶10}** On September 27, 2013, sometime in the late afternoon, M.M. was playing hide-and-seek with C.A., a boy who lived down the street, and her three siblings — her sister, age six, and her two brothers, ages six and ten. M.M. testified that when the children came home from school, M.M.'s brothers walked down the street to C.A.'s house and brought him back to their house to play with them. M.M. testified that she had known C.A. for about three weeks. Although she and her siblings played with C.A. "[a]bout every day," M.M. stated that she "didn't really know [him] that well."

**{¶11}** M.M. was the seeker. After counting to 20, she went to look for everyone. She first looked in the backyard but found no one. She then searched inside an abandoned garage located approximately five feet from her house. She found C.A. inside the garage listening to music on an MP3 player and tagged him. M.M. testified that after she tagged him, C.A. grabbed her wrist and held onto her tightly. M.M. stated that she told him to let go, but he refused. M.M. testified that C.A. then threatened her and said that if she did not do what he told her to do, he would hurt her sister. C.A. told M.M. to get on her knees. M.M. testified that she complied and that C.A. sat down on a cinder block with his back against the wall of the garage, pulled his pants down and "took

his private out." M.M. testified that she said, "no," "softly" and that while her mouth was open, he forced "his private area" into her mouth. She stated that she started to choke and moved to the side toward his thigh. When she was able to say "no" again, he stopped and M.M. started to spit on the ground.

{¶12} M.M. testified that she then heard her mother calling her. She and C.A. got up to leave, and C.A. pushed her out the door and followed her out of the garage. M.M. estimated that she was alone in the garage with C.A. for approximately 20 minutes. Although M.M. acknowledged that she had asked C.A. if she could use his MP3 player earlier in the day when they were both outside the garage (and that C.A. had then let her use it), she denied asking C.A. if she could use the MP3 player while the two were alone inside the garage playing hide-and-seek.

{¶13} M.M. testified that when she left the garage, she walked across a field to her house where her mother, Z.M., was waiting outside. M.M. testified that when her mother saw her, she asked her why her knees were dirty. At first, she did not respond. When Z.M. asked her a second time why her knees were dirty, M.M. started to cry. M.M. testified that she thought she was going to get in trouble for having dirty clothing as she had in the past. M.M. asked to go inside the house. Once inside, she "burst out with tears" and told her mother that "[C.A.] made me suck his private."

{¶14} Z.M. called M.M.'s Beech Brook counselor, Lena Oates, who said she would come to M.M.'s house. When Oates arrived, M.M. told her what had happened. Oates told Z.M. to call 696-KIDS and the police. After the police arrived, M.M. spoke

with a female officer and told her what had happened. The officer told Z.M. to take M.M. to the hospital, and Z.M. drove her to the hospital.

{¶15} M.M. testified that this was not the first time an incident like this had happened to her. When she was five or six years old, she was assaulted by one of her male cousins.

{¶16} M.M.'s mother, Z.M., was the next witness to testify. She testified that she had just finished speaking with Oates on the telephone and was sitting on her porch watching her children play with C.A. in the driveway. Z.M. testified that she knew C.A. as a "playmate of [her] children" and that he played with them on a "regular basis" until she "started to notice a difference in his demeanor" and became "uncomfortable with it." She testified that after she observed this, she would tell C.A. to go home or would make excuses or leave with the children to get rid of him. Z.M. stated that it was C.A.'s idea to play hide-and-seek. She testified that she heard him say to her children, "let's play hide-and-seek" and that, to her knowledge, her children had never played the game before because she did not allow it. She stated that "[t]his was one of his games that he played" that made her "uncomfortable."

{¶17} Z.M. testified that while she was sitting on the porch, she became concerned that her dinner might be burning and went inside briefly to check on it. Z.M. testified that when she came back outside, she did not see M.M. so she began to call for her. After calling for her three times, Z.M. saw M.M. coming out of the garage, followed by C.A. Z.M. testified that C.A. "pushed" M.M. out of the garage and that the two children

walked across a field toward the steps of M.M.'s house. Z.M. testified that M.M. had a "strange look on her face" and that both her knees had "big old circles," covered in a "real white looking grayish color dirt."

{¶18} Z.M. testified that she asked M.M. what had happened to her knees and that M.M. replied that she had fallen when she was climbing a fence, chasing the younger children. Z.M. told M.M. to turn around so that she could see if the rest of her clothing was dirty but did not see dirt anywhere else. Z.M. again asked M.M. why her knees were dirty. Z.M. testified that M.M. then "started to break." When she asked M.M. what was wrong, M.M. started to "scream and holler." Z.M. testified that she grabbed M.M. by the neck and dragged her inside the house. Z.M. stated that once they were inside, she again asked M.M. what was wrong. M.M. told her that "he made me suck his so-and-so," "saying it over and over and over," "screaming and hollering."

{¶19} Z.M. testified that while she was attempting to get M.M. "under control," she called Oates and tried to explain what had happened. Z.M. testified that Oates heard M.M. screaming in the background and asked her if M.M. was "saying what I think she['s] saying." Z.M. responded affirmatively. Oates told her she would be right over and to call the police. Z.M. called the police.

{¶20} Z.M. testified that while M.M. was "laying on the floor, screaming hollering hysterical," she went to the door and saw C.A. standing in the walkway in front of her house. Z.M. testified that she went outside and walked over to C.A. and told him to go home but C.A. just stood and looked at her. After a few minutes, he said "I ain't did

nothing" and slowly began walking away. As C.A. turned to walk away, Z.M. noticed that his shirt was "dirty from his neck [a]cross his shoulders all the way down to his waist" with the same dirt that was on the knees of M.M.'s pants. Z.M. had her cell phone so she took a picture of the back of his shirt. C.A. turned to look at her and "drawed his hand up" and said "get away from me." Z.M. testified that she was "[s]cared [C.A.] was going to hit [her]" and ran back into the house. Z.M. testified that when she came back inside the house, M.M. was "still in there all hysterical, slobbering all over the place, all over the floor * * * just totally out of control," screaming that "her mouth was hurting." Z.M. stated that there was nothing she could do for M.M. and that she just sat there and waited for Oates and the police to arrive.

{¶21} Z.M. testified that at some point later that day, she went into the garage to look around. She noticed that the floor of the garage was covered with leaves except for one area, i.e., "the spot where she say he laid her at." According to Z.M., the leaves had been "disturbed and distributed in that area." She testified that the same dirt that was on the children's clothes was on the floor of the garage in this area. Z.M. took several pictures of the garage, including the area where C.A. allegedly "laid [M.M.] down at."

{¶22} Z.M. testified that Oates and the police arrived at nearly the same time. When the police arrived, a female officer took M.M. aside and questioned her while Oates watched. Z.M. was not present during the interview; she was on the sidewalk speaking with a male officer. Z.M. testified that the police asked her what time the alleged incident occurred and where C.A. lived. Z.M. testified that she told the police

that the incident occurred between 6:00 and 6:30 p.m.   She stated that she did not know exactly where C.A. lived so M.M. showed the police where he lived.   After the police and Oates left, Z.M. drove M.M. to the hospital.   Z.M. testified that M.M. was upset and crying and did not want to go to the hospital.

{¶23} When they arrived at the hospital, M.M. was comforted by a nurse who took her into another area, questioned her about what had happened and performed a rape kit. Z.M. said that she was not present when this occurred.

{¶24} On cross-examination, Z.M. indicated that M.M. had had a counselor "for a period of time" because "[s]he had some coping issues."   She denied that M.M. had been diagnosed with post-traumatic stress disorder but indicated that M.M. had "had an issue before" with a male child (but denied that he was a cousin) and was in counseling to address that issue.   Z.M. further acknowledged that she herself had "a history of [a] lot of traumas" but stated that she was "not going to get into it."

{¶25} Sometime after the incident, Z.M. took M.M. to see her own doctor because M.M. had been complaining that her mouth hurt.   Z.M. testified that the doctor examined M.M.'s mouth to see if she had sustained an injury but that Z.M. was not informed of any injuries.

{¶26} Lena Oates, a qualified mental health specialist who had worked for Beech Brook, also testified.   Oates stated that M.M. was a client when she worked at Beech Brook and that M.M. had been referred to the agency due to a diagnosis of post-traumatic stress disorder following a prior sexual assault.   She testified that M.M. was a "high risk

case" and that she met with M.M. face-to-face at least once a week. Although M.M. was only ten at the time, Oates testified that she "struggled with things that typical teenagers struggled with," such as problematic behavior in school, not listening to her mother, lying to her mother regarding matters such as food hoarding, chores, bathing and incidents involving her siblings, "manipulating situations to get out of things" and lying to "avoid the consequences." She testified that M.M.'s treatment plan involved her "being more responsible and accountable for her behaviors."

{¶27} Oates testified that shortly before the incident, she had been on the phone with Z.M. for approximately 45 minutes, discussing M.M.'s treatment plan. Less then five minutes after she hung up with Z.M., Z.M. called her back and put M.M. on the phone. Oates testified that initially, M.M. "literally hollered * * * just hollered * * * [l]ike [in] a horror movie." When Oates asked M.M. what was wrong, M.M. told her, "he made me do it, he made me suck his dick." After M.M. said this, Oates told M.M. to put her mother back on the phone. Oates testified that she did not really understand what had happened and asked Z.M. "is she saying what I'm hearing her saying[?]" Although Z.M. was "a bit escalated," she told Oates what had happened. Oates told Z.M. to call the police and that she would come over. Oates then called her supervisor, got clearance to proceed, and went to Z.M.'s house, arriving more than an hour later. When she arrived, M.M. was "not in a crisis state any longer." She was "still upset" but was able to talk with Oates and explain what had happened. Oates testified that Z.M. "was very

escalated" but was able to provide details as well. They then waited for the police to arrive.

**{¶28}** Oates testified that hours later, two officers responded, one male officer and one female officer. Oates explained to the police who she was, gave them her contact information and, with Z.M.'s consent, disclosed M.M.'s diagnosis of post-traumatic stress disorder. Oates was present when the female officer spoke with M.M. The police officers did not take a statement from Oates. Oates denied that she told the officers that "something in [M.M.'s] story was not adding up" or that M.M.'s body language, inconsistent statements or changing behavior suggested to Oates that M.M. may not have been telling the whole story. Oates stated that she did not think M.M. was lying about what had happened to her and that even if there were inconsistencies in what M.M. was saying, she would not have mentioned them to the police because M.M. is her client and, as such, it is her job to advocate on her behalf and support her.

**{¶29}** Stephanie Grossman, a sexual assault nurse examiner ("SANE nurse") at Rainbow Babies and Children's Hospital, examined M.M. the evening of the incident. Grossman explained that when a sexual assault is disclosed by a patient, a SANE nurse is called in to interview the patient. Grossman testified that prior to examining M.M., she obtained a medical history from her, including a statement regarding what had brought her to the hospital. Grossman testified that M.M. was calm, reserved, quiet and respectful and that she answered the questions asked of her. Grossman testified that based on the history she obtained, she performed an examination to determine whether

M.M. had sustained any physical injuries and administered a rape kit and a pregnancy test. Grossman stated that her exam revealed no physical injuries and that no other medical treatment of M.M. was required. She testified that her examination was consistent with the history M.M. had provided.

{¶30} Yashila Crowell, with the East Cleveland Police Department, was the detective assigned to follow up on the case. She testified that her investigation consisted of (1) contacting Officer Dominique King, the patrol officer who wrote the police report of the incident, to address a couple of questions she had after reviewing the report, (2) executing a search warrant to collect a DNA buccal swab from C.A. and (3) attending a meeting the prosecutor's office had scheduled with M.M. and her mother in October 2013. Detective Crowell testified that shortly after she was assigned to the case, she contacted Z.M. and requested a face-to-face meeting with M.M. but that "due to some other situations that [Z.M.] was going through," Z.M. did not bring M.M. in to speak with her. Detective Crowell testified that she never spoke with C.A. and only spoke with his mother briefly when executing the search warrant "just to let her know what was going on."

{¶31} Detective Crowell acknowledged on cross-examination that M.M.'s testimony at the hearing was inconsistent with what was documented in the police report, i.e., according to the police report, M.M. had told the responding officer that when she found C.A. in the garage, she had asked to use his MP3 player, and he had denied her request, stating that it belonged to his uncle. Detective Crowell stated that she spoke with

M.M. only once, during the meeting at the prosecutor's office, and that M.M. did not contradict herself during that conversation. She further stated that M.M.'s description of the incident when testifying at the hearing was consistent with what she had stated had occurred during the October 2013 meeting at the prosecutor's office.

{¶32} Detective Crowell also acknowledged that Oates's testimony at the hearing was inconsistent with what had been documented in the police report. Although when testifying at the hearing Oates denied making any comments to police regarding the consistency of M.M.'s statements, Detective Crowell acknowledged that the police report indicated that Oates had told police that "there were problems with [M.M.'s] story," that "something in [her] story didn't add up," and that, as she told her story, M.M. "eventually smirked" and "smiled."

{¶33} No written statements were provided by M.M., Z.M.,C.A. or Oates to the police regarding the incident. Both Officer King and the other officer who responded at the scene, Officer Huppy, left the department before the trial and did not testify.

{¶34} The state rested its case and moved to have its exhibits, including M.M.'s medical records related to the incident, admitted into evidence. The parties agreed on the exhibits to be admitted, and the court admitted these exhibits. C.A. then moved to dismiss the complaint, arguing that, based on inconsistencies among the witnesses' testimony, Oates's testimony regarding M.M.'s past use of fabrications to "get out of trouble" and inconsistencies between what the witnesses testified to and what was

documented in the police report, the state had failed to present sufficient evidence that C.A. had raped M.M. The juvenile court denied the motion.

{¶35} Defense counsel then moved to have the page containing M.M.'s patient history stricken from the exhibit of M.M.'s medical records. Although the juvenile court had sustained an earlier objection C.A. had made when the state sought to have Grossman read from the patient history section during her direct examination, the juvenile court denied the motion to strike, stating that it had sustained the earlier objection only "with regard to her reading [M.M.'s patient history] to me * * * as though to give it some weight that it doesn't necessarily have to give."

{¶36} C.A. was the sole witness to testify in his defense. He testified that on September 27, 2013, at approximately 6:00 p.m., M.M.'s three siblings came over to his house and asked C.A. if he wanted to play with them. C.A. agreed to play with the children and walked with them back to their house.

{¶37} C.A. testified that M.M.'s sister decided that the children should play hide-and-seek. During the second game of hide-and-seek, M.M. was the seeker. C.A. testified that he hid in the garage and was sitting on a concrete block leaning against the wall, listening to music on his uncle's MP3 player, when M.M. found him. C.A. testified that M.M. "was sitting on her knees" next to him and asked if she could see the MP3 player. C.A. testified he told her, "no," because it was his uncle's MP3 player and his uncle had told him not to let anyone else use it. When C.A. told M.M. she could not use the MP3 player she became "sad," then "upset." C.A. testified that M.M. asked him

repeatedly to let her see the MP3 player and that each time he told her, "no," "she got even more madder." C.A. testified that he "got mad" and stood up and walked towards the door to the garage. When M.M.'s mother began calling for her, both children left the garage. M.M. left the garage first and walked towards her mother. C.A. followed behind her. C.A. estimated that the children had been playing hide-and-seek for approximately 30 minutes and that he and M.M. had been in the garage alone together for approximately three to five minutes.

{¶38} C.A. testified that when M.M. reached her mother, he heard Z.M. ask her why her knees were dirty. He said that M.M. told her that she fell. He testified that Z.M. then asked M.M. the same question again "but with a serious look." He testified that M.M. kept telling her mother that she had fallen. He testified that Z.M. then asked M.M. to go inside the house. After they went inside, C.A. heard yelling, screaming and crying. C.A. testified that he asked M.M.'s brothers and sister to go up to the house to see if M.M. was okay. The children went up to the house and asked their mother if M.M. was okay, but Z.M. did not respond and "slammed the door in their face[s]."

{¶39} C.A. and the other children then decided to play freeze tag. They played for a few minutes before Z.M. came out of the house and told C.A. he had to leave. C.A. testified that he could see and hear M.M. crying inside the house. C.A. told Z.M. "okay" and that he "didn't do anything." He told the other children he would see them later. C.A. testified that he assumed the yelling and crying had something to do with him

because Z.M. had asked him to leave. He stated that he "basically figured" that M.M. was "still mad and upset" about his refusal to let her play with the MP3 player.

{¶40} C.A. testified that as he began walking away, Z.M. "got even more mad because she noticed [his] back was dirty." He testified that Z.M. told him to "come here" and pulled out her cell phone. C.A. testified that he turned and walked away and that Z.M. followed him, chasing him and taking pictures of him with her cell phone camera.

{¶41} C.A. testified that when he got back to his house around 6:30 p.m., his mother came out, and Z.M. turned and "took off" back toward her house. C.A. testified that he told his mother what had happened, i.e., that he and M.M. had gotten into an argument about the MP3 player and that Z.M. had chased him with her cell phone camera. He then took a shower and went to sleep. C.A. testified that he woke up around 10:00 or 11:00 p.m. because police officers were knocking at the door. C.A. testified that he opened the door and that the officers asked him a few questions, including what had happened. He stated that he told the officers the "same story" as that to which he had testified. He testified that the officers "basically got confused" and indicated that they were "trying to figure out how * * * I did this to her and about me and her arguing over something stupid." C.A.'s mother told him to go inside, closed the door and began speaking with the officers.

{¶42} C.A. testified that after the officers left, he and his mother went upstairs to talk with his grandfather. His mother left to go to the store, and C.A. fell back asleep.

He awoke a second time when his mother came in and told him that police officers were coming to take him to the police station. C.A. testified that he was arrested, taken to the police station and "basically handcuffed to a chair for hours."

{¶43} After C.A. testified, the defense rested, and defense counsel renewed his motion to dismiss based on the same arguments he had raised previously. Once again, the juvenile court denied the motion. On August 28, 2014, the juvenile court adjudicated C.A. delinquent by reason of rape in violation of R.C. 2907.02(A)(1)(b).

{¶44} On January 29, 2015, the juvenile court held a dispositional hearing. The court ordered that C.A. be placed on community control for six months, that he re-engage mental health services and that he receive sex offender treatment through the Protect program. C.A. appealed, raising the following four assignments of error for review:

> First Assignment of Error: The trial court erred to the prejudice of the appellant by denying access to child protective services records of an interview with the alleged victim, as the court did not even examine the records in-camera to determine if they were exculpatory or relevant.
>
> Second Assignment of Error: The trial court erred to the prejudice of the appellant in denying the motion for dismissal pursuant to Rule 29 of the Ohio Rules of Criminal Procedure, in that the evidence presented was insufficient as a matter of law.
>
> Third Assignment of Error: The finding of delinquency by reason of rape was against the manifest weight of the evidence.
>
> Fourth Assignment of Error: The trial court erred to the prejudice of the appellant by permitting testimony as to statements allegedly made by the victim to a hospital nurse, as said statements constitute impermissible hearsay.

**Law and Analysis**

{¶45} For ease of discussion, we consider C.A.'s second and third assignments of error first.

**Sufficiency of the Evidence and the Manifest Weight of the Evidence**

{¶46} In his second and third assignments of error, C.A. argues that the juvenile court erred in denying his motion to dismiss and that his adjudication of delinquency is against the manifest weight of the evidence. He claims that M.M.'s and Z.M.'s testimony was not credible and that due to the "conflicts" and "confusion" in M.M.'s testimony and that of the other of the state's witnesses, "[i]t cannot be ascertained with any degree of certainty what, if anything, occurred * * * between M.M. and C.A." As such, he contends the delinquency finding must be overturned.

{¶47} A juvenile court may adjudicate a juvenile to be a delinquent child when the evidence demonstrates, beyond a reasonable doubt, that the child committed an act that would constitute a crime if committed by an adult. R.C. 2151.35(A); Juv.R. 29(E)(4); *In re R.S.*, 8th Dist. Cuyahoga No. 99562, 2013-Ohio-5576, ¶ 26; *In re Williams*, 3d Dist. Marion No. 9-10-64, 2011-Ohio-4338, ¶ 18. Due to the "'inherently criminal aspects' of delinquency proceedings * * *" claims involving the sufficiency of the evidence and the manifest weight of the evidence in delinquency appeals are subject to the same standards of review applicable to criminal convictions. *In re T.J.*, 9th Dist. Summit No. 27269, 2014-Ohio-4919, ¶ 19, quoting *In re L.F.*, 9th Dist. Lorain No. 10CA09880, 2012-Ohio-302, ¶ 6; *In re R.S.* at ¶ 26, citing *In re Watson*, 47 Ohio St.3d 86, 91, 548 N.E.2d 210 (1989).

**{¶48}** We review a trial court's denial of a defendant's motion under Crim.R. 29 using the same standard we apply when reviewing a sufficiency-of-the-evidence claim. *State v. Taylor*, 8th Dist. Cuyahoga No. 100315, 2014-Ohio-3134, ¶ 21-23 ("Crim.R. 29(A) and sufficiency of evidence review require the same analysis."), citing *Cleveland v. Pate*, 8th Dist. Cuyahoga No. 99321, 2013-Ohio-5571.

**{¶49}** When reviewing sufficiency of the evidence, we must determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991), paragraph two of the syllabus. We do not assess whether the state's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the adjudication. *State v. Starks*, 8th Dist. Cuyahoga No. 91682, 2009-Ohio-3375, ¶ 25, citing *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997); *Jenks* at paragraph two of the syllabus.

**{¶50}** The juvenile court found C.A. delinquent for rape in violation of R.C. 2907.02(A)(1)(b). R.C. 2907.02(A)(1)(b) provides, in relevant part: "No person shall engage in sexual conduct with another who is not the spouse of the offender * * * when * * * [t]he other person is less than thirteen years of age, whether or not the offender knows the age of the other person." "Sexual conduct" includes fellatio. R.C. 2907.01(A).

**{¶51}** We do not consider the credibility of the witnesses when reviewing a sufficiency-of-the-evidence claim. *State v. Williams*, 8th Dist. Cuyahoga No. 98528,

2013-Ohio-1181, ¶ 27; *State v. Yarbrough*, 95 Ohio St.3d 227, 2002-Ohio-2126, 767 N.E.2d 216, ¶ 79. We assume the state's witnesses testified truthfully and determine whether that testimony (and any other evidence presented) satisfies each element of the offense. The testimony of one witness, if believed by the factfinder, is enough. *See, e.g., State v. Adams,* 5th Dist. Licking No. 14-CA-25, 2014-Ohio-4233, ¶ 14 ("the testimony of one witness, believed by the [trier of fact], is sufficient to establish a fact in question"); *see also State v. Strong*, 10th Dist. Franklin No. 09AP-874, 2011-Ohio-1024, ¶ 42 (in a criminal case, "the testimony of one witness, if believed by the jury, is enough to support a conviction").

{¶52} In this case, M.M. testified that on September 27, 2013, when she was less than 13 years old, C.A. inserted his penis inside her mouth. There was no dispute that she was not his spouse. M.M.'s testimony, if believed, was sufficient to support the juvenile court's finding of delinquency due to rape in violation of R.C. 2907.02(A)(1)(b). Although, as C.A. points out, there was some confusion and inconsistencies in M.M.'s testimony, including with regard to the number of individuals she spoke with about the incident — four, six or seven — the timing and sequencing of certain events, and her understanding of the words "accident" and "incident," M.M.'s testimony was clear and unequivocal that C.A. inserted his penis into her mouth when the two children were alone together in the garage. Further, some of the perceived inconsistencies and confusion in M.M.'s testimony appear to be attributable to the form of the questions she was asked and

M.M.'s clear misunderstanding of those questions.[3]   Based on our review of the record, after viewing the evidence in a light most favorable to the prosecution, we cannot state that a rational trier of fact could not have found the essential elements of rape under R.C. 2907.02(A)(1)(b) proven beyond a reasonable doubt.   Accordingly, C.A.'s adjudication of delinquency for rape was supported by sufficient evidence.

{¶53} We likewise find no merit to C.A.'s claim that his delinquency adjudication was against the manifest weight of the evidence.   In determining whether a delinquency adjudication is against the manifest weight of the evidence, we review the entire record, weigh the evidence and all reasonable inferences, consider the credibility of witnesses, and determine whether in resolving conflicts in the evidence the juvenile court clearly lost its way and created such a manifest miscarriage of justice that the adjudication must be reversed.   *In re R.S.*, 2013-Ohio-5576, at ¶ 27; *Thompkins* at 387, citing *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1st Dist.1983).   "The use of the word 'manifest' means that the trier of fact's decision must be plainly or obviously contrary to all of the evidence.   This is a difficult burden for an appellant to overcome because the resolution of factual issues resides with the trier of fact."   *State v. Battiste,* 8th Dist Cuyahoga No. 102299, 2015-Ohio-3586, ¶ 19, citing *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.   The credibility of the witnesses and the weight to be given the evidence are primarily for the trier of fact to assess.   *State v. Bradley*, 8th Dist. Cuyahoga No. 97333, 2012-Ohio-2765, ¶ 14, citing *State v. DeHass*,

---

[3]At the time she testified, M.M. was 11 years old.

10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus. The trier of fact is in the best position to take into account inconsistencies, along with the witnesses' manner, demeanor, gestures and voice inflections, in determining whether the proffered testimony is credible. *State v. Holloway,* 8th Dist. Cuyahoga No. 101289, 2015-Ohio-1015, ¶ 42, citing *State v. Kurtz*, 8th Dist. Cuyahoga No. 99103, 2013-Ohio-2999, ¶ 26.

{¶54} C.A.'s manifest weight challenge is based on virtually the same arguments and evidence as his sufficiency challenge — i.e., the purported inconsistencies and confusion in M.M.'s testimony; M.M.'s history of behavioral issues; contradictory, confusing testimony by Z.M.; Z.M.'s dislike of, and "suspicions" relating to, C.A.; and contradictions between Oates's testimony and what she reportedly told the responding officers according to the police report. Although, as noted above, there are some inconsistencies in the witnesses' testimony, a defendant is not entitled to reversal on manifest weight grounds merely because the factfinder heard inconsistent or contradictory testimony. *In re D.M.D.*, 10th Dist. Franklin No. 14AP-289, 2015-Ohio-1134, ¶ 18; *State v. Wade*, 8th Dist. Cuyahoga No. 90029, 2008-Ohio-4574, ¶ 38, citing *State v. Asberry*, 10th Dist. Franklin No. 04AP-1113, 2005-Ohio-4547, ¶ 11. The decision whether, and to what extent, to believe the testimony of a particular witness is "within the peculiar competence of the factfinder, who has seen and heard the witness." *State v. Johnson*, 8th Dist. Cuyahoga No. 99822, 2014-Ohio-494, ¶ 54.

{¶55} This case came down to the credibility of M.M. and C.A. and the two very different versions of events each provided. The juvenile court was presented with reasons to question M.M.'s credibility, such as the fact that although M.M. claimed that C.A. grabbed her wrist, held it tightly and forced her to her knees, she sustained no bruising or other physical injury, M.M.'s admission that she was afraid she would "get into trouble" due to her dirty knees, her history of behavioral issues and the fact that she was known to "manipulate situations" and lie to her mother and others to "avoid the consequences" of her actions, and the fact that others had allegedly expressed concerns regarding the veracity of M.M.'s version of the events.

{¶56} But, as detailed above, the juvenile court was also given reasons to believe M.M.'s testimony, including her demeanor following the incident, the fact that once she was inside the house, she promptly told her mother what had happened, and the fact that she told the same version of events to numerous others, including her counselor and the detective. It was within the province of the juvenile court, as the trier of fact, to believe M.M. and to disbelieve C.A. "'The choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact.'" *In re N.J.M.*, 12th Dist. Warren No. CA2010-03-026, 2010-Ohio-5526, ¶ 39, quoting *State v. Awan*, 22 Ohio St.3d 120, 123, 489 N.E.2d 277 (1986). The judge was present in the courtroom with the witnesses; therefore, she was in the best position to assess the credibility of M.M., C.A. and the other witnesses.

**{¶57}** After careful review of the record in its entirety, weighing the strength and credibility of the evidence presented and the inferences to be reasonably drawn therefrom, we cannot say that the juvenile court clearly lost its way and created such a manifest miscarriage of justice that C.A.'s delinquency adjudication by reason of rape was against the manifest weight of the evidence. Accordingly, C.A.'s second and third assignments of error are overruled.

### Prior History Statements in Medical Records

**{¶58}** In his fourth assignment of error, C.A. argues that the juvenile court improperly permitted Grossman, the SANE nurse who examined M.M. at the hospital following the incident, to testify regarding statements M.M. made to her regarding the alleged rape. C.A. contends that M.M.'s statements to Grossman constituted inadmissible hearsay and that the juvenile court violated C.A.'s Sixth Amendment right of confrontation by permitting Grossman to testify regarding those statements.

**{¶59}** The decision to admit or to exclude evidence is left to the sound discretion of the juvenile court and will not be reversed absent an abuse of that discretion. *In re Shubutidze*, 8th Dist. Cuyahoga No. 77879, 2001 Ohio App. LEXIS 996, *9 (Mar. 8, 2001); *State v. Gale*, 8th Dist. Cuyahoga No. 94872, 2011-Ohio-1236, ¶ 12, citing *State v. Finnerty,* 45 Ohio St.3d 104, 107, 543 N.E.2d 1233 (1989). An abuse of discretion implies that the court's decision was unreasonable, arbitrary or unconscionable. *Blakemore v. Blakemore,* 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

{¶60} The record does not support C.A.'s contention.  First, Grossman did not testify as to the content of any statements M.M. made to her.  When Grossman, at the state's request, began reading into the record the portion of M.M.'s medical records that contained M.M.'s patient history narrative during her direct examination, defense counsel objected on hearsay grounds.   The following exchange then occurred:

> THE COURT: Okay.  You really want me to hear that statement. And the question becomes why.  If she relied upon the statement and from that statement she did the next step, then that's all I really need to hear. Because I don't really need to emphasize the victim's statement, unless what, I'm missing something?  Ms. Grossman, from the history that you obtained, what did you do next?

> THE WITNESS: I did the exam to determine if there was an injury to her body.

> THE COURT: And after that examination, did you — what did you then do next?

> THE WITNESS: I did not see any physical injury.  There was no other treatment that was required.  A pregnancy test was done.  And I do believe that was the extent of that.

> THE COURT: You may continue your inquiry.

{¶61} Grossman never testified as to the content of what M.M. told her, only that she obtained a patient history from M.M. and the actions she took in response to that history, i.e., that she examined M.M. for physical injuries, performed a rape kit, and administered a pregnancy test.  Although Grossman did not testify regarding the content of the statements M.M. made at the hospital, the juvenile court did admit the medical records from M.M.'s hospital visit into evidence, including — over C.A.'s belated objection — the page of the medical records that documented M.M.'s statements to

Grossman regarding her prior history. Even if we were to interpret C.A.'s assignment of error as extending to the juvenile court's admission of the prior history section of M.M.'s medical records, we would still find no reversible error.

**{¶62}** The Sixth Amendment to the United States Constitution states: "In all criminal prosecutions, the accused shall enjoy the right * * * to be confronted with the witnesses against him." Hearsay is an out-of-court statement offered to prove the truth of the matter asserted. Evid.R. 801(C). Therefore, "[w]henever the state seeks to introduce hearsay into a criminal proceeding, the court must determine not only whether the evidence fits within an exception [to the hearsay rule], but also whether the introduction of such evidence offends an accused's right to confront witnesses against him. *State v. Kilbane*, 8th Dist. Cuyahoga No. 99485, 2014-Ohio-1228, ¶ 29. The right of confrontation also applies in juvenile delinquency hearings. *See, e.g., In re Wise,* 7th Dist. Jefferson No. 05 JE 40, 2007-Ohio-1393, ¶ 69; *In re Sturm*, 4th Dist. Washington No. 05CA34, 2006-Ohio-3122, ¶ 17.

**{¶63}** In this case, however, M.M. testified at the hearing and was subject to cross-examination by C.A.; therefore, there was no violation of C.A.'s confrontation rights. *See, e.g., State v. Buzanowski,* 8th Dist. Cuyahoga No. 99854, 2014-Ohio-1947, ¶ 52; *see also State v. Rose,* 12th Dist. Butler No. CA2011-11-214, 2012-Ohio-5607, ¶ 47 (where child victim was present at trial and subject to cross-examination, the Confrontation Clause presented "no constraints" on state's use of child's prior statements to a SANE nurse examiner), citing *State v. Gray*, 12th Dist. Butler No. CA2011-09-176,

2012-Ohio-4769, ¶ 48 (noting that when the declarant is present at trial and subject to cross-examination, the Confrontation Clause presents no constraints on the use of the prior testimonial statement); *State v. Powell*, 132 Ohio St.3d 233, 2012-Ohio-2577, 971 N.E.2d 865, ¶ 64 ("The admission of hearsay does not violate the Confrontation Clause if the declarant testifies at trial."). Moreover, Grossman also testified at trial and was subject to cross-examination by C.A.

{¶64} Evid.R. 803(4) provides a hearsay exception for "[s]tatements made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment." The state argues that M.M.'s description of the alleged rape documented in the patient history section of the medical records was made for the purpose of obtaining medical treatment and, therefore, admissible under Evid.R. 803(4). C.A. argues that because Grossman performed a rape kit and took M.M.'s underpants and leggings, M.M.'s statements were made in connection with a criminal investigation and, therefore, did not fall within the hearsay exception applicable to statements made for medical diagnosis or treatment.

{¶65} In *State v. Ceron*, 8th Dist. Cuyahoga No. 99388, 2013-Ohio-5241, this court explained the application of Evid.R. 803(4) to statements made by assault victims to SANE nurses as follows:

"In sexual assault cases such as the case at bar, there is often testimony from a sexual assault nurse. Similar to the dual role of a social worker

interviewing a child who may be a victim of sexual abuse, these nurses often perform a dual role involving both medical diagnosis and treatment and the investigation and gathering of evidence. *See State v. Arnold*, 126 Ohio St.3d 290, 2010-Ohio-2742, ¶ 33, 933 N.E.2d 775 (acknowledging the dual role of the social worker in interviewing a child who may be a victim of sexual abuse from both an investigatory and medical perspective). Only those statements made for the purpose of diagnosis and treatment are admissible under Evid.R. 803(4). *See Arnold* at ¶ 28; *State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944, ¶ 47. Accordingly, the salient inquiry when determining whether a hearsay statement is admissible under Evid.R. 803(4), is whether the statement was made for purposes of diagnosis or treatment rather than for some other purpose. *See Muttart* at ¶ 47. One such 'other purpose' is the gathering of forensic information to investigate and potentially prosecute a defendant. *Arnold* at ¶ 33. To the extent that a victim's statement to a nurse is for investigative purposes in furtherance of such criminal prosecution, the statements will not fall within the hearsay exception under Evid.R. 803(4)."

*Id.* at ¶ 56-60 (statement by alleged five-year-old sexual assault victim to sexual assault nurse was for the purpose of medical diagnosis and treatment and, therefore, admissible under Evid.R. 804(3)), quoting *State v. Rose*, 12th Dist. Butler No. CA2011-11-214, 2012-Ohio-5607, ¶ 42; *see also State v. Burgess*, 162 Ohio App.3d 291, 2005-Ohio-3747,

833 N.E.2d 352, ¶ 26-28 (2d Dist.) (evidence of eleven-year-old victim's statements to emergency room nurse concerning alleged rapes was admissible under Evid.R. 803(4) notwithstanding that nurse was required to ask victim for history as part of rape kit).

{¶66} In this case, although Grossman collected certain evidence during her examination of M.M. that could be used in the criminal rape investigation, the record supports the conclusion that M.M. would have reasonably understood that the purpose for her describing the circumstances of the rape to Grossman was to receive medical care, rather than to assist in the criminal investigation. M.M. had already spoken with the police and given them a statement before her mother took her to the hospital.

{¶67} Grossman testified that her purpose in taking the history was "to find out if there was any injury to [M.M.'s] health" and to determine the proper scope of the examination or treatment to be provided. She testified that as a result of the history she obtained from M.M., she performed a rape kit, examined M.M. for physical injuries and administered a pregnancy test.

{¶68} As this court has recognized:

"A victim's statement that she had been raped is relevant for medical diagnosis and treatment because it directs medical providers to examine the genital areas for physical injury, administer a pregnancy test, and prescribe medications for the prevention of sexually transmitted diseases * * *. A patient's statements concerning how the alleged rape occurred can be relevant to show the 'general cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.' Evid.R. 803(4). For example, the victim's statements may guide medical personnel to the particular area(s) of the victim's body to be examined for injury, as well as indicate which areas may need more immediate treatment than others. *State v. Menton*, 7th Dist. No. 07 MA 70, 2009-Ohio-4640, ¶ 51 ('* * * the description of how the [sexual] assault took place, over how long of a

period, how many times a person was hit, choked or penetrated, and what types of objects were inserted are all specifically relevant to medical treatment. They are part of the medical history. They are the reason for the symptoms. They let the examiner know where to examine and what types of injuries could be latent.').''

*State v. Bowleg*, 8th Dist. Cuyahoga Nos. 100263 and 100264, 2014-Ohio-1433, ¶ 19, quoting *State v. Wallace*, 3d Dist. Union No. 14-10-20, 2011-Ohio-1728, ¶ 18. The fact that it was determined, following her examination and the administration of the pregnancy test, that M.M. did not require any further medical treatment does not mean that her statements to Grossman regarding what happened during the alleged rape were not for the purpose of medical diagnosis and treatment.

{¶69} Based on the record before us, we find that M.M.'s statements to Grossman regarding how and when she was allegedly raped and who raped her were admissible under Evid.R. 803(4). As such, the juvenile court did not abuse its discretion in admitting the portion of M.M.'s medical records containing those statements. *See, e.g., State v. Richardson*, 12th Dist. Clermont Nos. CA2014-03-023, CA2014-06-044 and CA2014-06-045, 2015-Ohio-824, ¶ 36 (child-victim's statements to child advocacy social worker and forensic examiner regarding the identity of the perpetrator, the type of abuse alleged, the time frame of the alleged abuse and identification of the areas where the child had been touched were made for purpose of medical diagnosis and treatment and were, therefore, admissible under Evid.R. 803(4)), citing *Arnold, supra*.

{¶70} Although certain details M.M. provided to Grossman regarding the incident extended beyond what was needed for medical treatment and diagnosis and, therefore, did

not fall within the Evid.R. 803(4) hearsay exception, we find that the juvenile court's admission of those statements — when admitting the entirety of M.M.'s medical records and patient history into evidence — was harmless error.

{¶71} "Any error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." Crim.R. 52(A). An error does not affect substantial rights if there is no reasonable probability that the error contributed to the defendant's conviction or, in this case, delinquency adjudication. *State v. Brown*, 65 Ohio St.3d 483, 485, 605 N.E.2d 46 (1992).

{¶72} The following analysis has been established by the Ohio Supreme Court "to guide appellate courts in determining whether an error has affected the substantial rights of a defendant, thereby requiring a new trial":

> First, it must be determined whether the defendant was prejudiced by the error, i.e., whether the error had an impact on the verdict. Second, it must be determined whether the error was not harmless beyond a reasonable doubt. Lastly, once the prejudicial evidence is excised, the remaining evidence is weighed to determine whether it establishes the defendant's guilt beyond a reasonable doubt.

*State v. Harris*, 142 Ohio St.3d 211, 2015-Ohio-166, 28 N.E.3d 1256, ¶ 37, citing *State v. Morris*, 141 Ohio St.3d 399, 2014-Ohio-5052, 24 N.E.3d 1153. Here, although the juvenile court erred in admitting the entire prior history section of M.M.'s medical records into evidence — and not just those statements made for purpose of medical

diagnosis and treatment — C.A. was not prejudiced because there is no reasonable possibility that the admission of the statements impacted the delinquency adjudication.

**{¶73}** First, this case involved a bench trial; therefore, "it is presumed the juvenile court only considered admissible evidence." *In re B.T.B.*, 12th Dist. Butler No. CA2014-10-199, 2015-Ohio-2729, ¶ 35; *see also State v. Warren*, 8th Dist. Cuyahoga No. 83823, 2004-Ohio-5599, ¶ 47, citing *State v. Davis*, 63 Ohio St.3d 44, 584 N.E.2d 1192 (1992). M.M. testified at length regarding what happened to her and was subject to substantial cross-examination by the defense. Although there are arguably some differences in the details between what M.M. testified to and the statements reflected in her medical records, the prior history narrative in M.M.'s medical records contains the same basic description of the incident that M.M. testified to at the hearing, i.e., that C.A. grabbed her arm, told her to kneel on the ground and inserted his penis into her mouth. *See, e.g., State v. Buzanowski,* 8th Dist. Cuyahoga No. 99854, 2014-Ohio-1947, ¶ 53 (error in admitting victim's narrative to SANE nurse was harmless pursuant to Crim.R. 52(A) because it was merely cumulative to the admissible testimony of the victim), citing *State v. Simmons,* 8th Dist. Cuyahoga No. 98613, 2013-Ohio-1789, ¶ 28; *State v. Pence*, 12th Dist. Warren No. CA2012-05-045, 2013-Ohio-1388, ¶ 38 (even if trial court erred in admitting statements victim made to child protective services worker under Evid.R. 804(3), error was harmless because her testimony was cumulative of victim's testimony); *State v. Ruff*, 2013-Ohio-3234, 996 N.E.2d 513, ¶ 20-21 (1st Dist.) (where purpose of victim's statements was for medical diagnosis and treatment, even if a few of the details

extended beyond what victim needed to say for purposes of obtaining treatment, any error in the admission of such statements was harmless), *rev'd on other grounds*, 143 Ohio St.3d 114, 2015-Ohio-995, 34 N.E.3d 892; *Rose,* 2012-Ohio-5607 at ¶ 46-48 (where there was "little evidence to suggest" that victim's statement to SANE nurse "aided in any sort of diagnosis or medical treatment," but rather related primarily to the investigation of the defendant, SANE nurse's report containing the victim's statement did not fall within the hearsay exception under Evid.R. 803(4); however, because victim "provided substantial testimony regarding the events of the night," including what she detailed to the SANE nurse and the defense conducted a "substantial cross-examination" of the victim, trial court's error in admitting report was harmless).

**{¶74}** Second, there is nothing in the record that suggests that the juvenile court relied on M.M.'s statements as documented in her medical records — as opposed to her testimony at the hearing — in reaching its decision in this case. To the contrary, the record supports the conclusion that the juvenile court did not rely on M.M.'s statements to Grossman regarding the alleged rape. When ruling on C.A.'s objections related to M.M.'s statements to the SANE nurse, the judge indicated that she "[did]n't really need to emphasize the victim's statement," that it was sufficient for her purposes that Grossman "relied upon [M.M.'s] statement and from that statement * * * did the next step" and that she was not inclined "to give some weight [to the prior history section of M.M.'s medical records] that it doesn't necessarily have to give." Finally, as explained above, the state presented substantial evidence separate and apart from any inadmissible statements

contained in M.M.'s medical records, which supported the juvenile court's delinquency determination beyond a reasonable doubt. Accordingly, the error in admission of the entirety of M.M.'s medical records was harmless. C.A.'s fourth assignment of error is overruled.

**CCDCFS Records**

{¶75} In his first assignment of error, C.A. contends that the juvenile court erred and violated his due process rights by denying him access to CCDCFS records relating to the subject incident. C.A. argues that because the case was "based solely on the victim's word," any inconsistency in M.M.'s story was "critically important to the defense" and that C.A., therefore, "should have had access to what was told to [CCDCFS] caseworkers" or, at the very least, the juvenile court should have conducted an in camera review of the records to determine whether they contained any inconsistencies or exculpatory information relevant to his defense. The state responds that the juvenile court's ruling on the motion to quash was within its discretion because C.A. failed to show "adequate good cause" to be permitted access to the confidential CCDCFS records.

{¶76} We review a trial court's decision in a discovery matter for abuse of discretion. *In re D.M.*, 140 Ohio St.3d 309, 2014-Ohio-3628, 18 N.E.3d 404, ¶ 9, citing *State ex rel. Denton v. Bedinghaus*, 98 Ohio St.3d 298, 2003-Ohio-861, 784 N.E.2d 99, ¶ 31.

{¶77} Under Juv.R. 24(A)(6) and the Due Process Clauses of the Ohio Constitution and the United States Constitution, a juvenile respondent is entitled to

discovery of evidence that is "favorable to the respondent and material either to guilt or punishment." Juv.R. 24(A)(6) ("In delinquency and unruly child proceedings, the prosecuting attorney shall disclose to respondent's counsel all evidence, known or that may become known to the prosecuting attorney, favorable to the respondent and material either to guilt or punishment."); *In re D.M.* at ¶ 16 ("A prosecuting attorney is under a duty imposed by Juv.R. 24(A)(6) and the Due Process Clauses of the Ohio Constitution and the United States Constitution to disclose to a juvenile respondent all evidence in the state's possession that is favorable to the juvenile and material to either guilt, innocence, or punishment."); *State v. Iacona*, 93 Ohio St.3d 83, 91, 752 N.E.2d 937 (2001) (Juv.R. 24 imposes a duty, corresponding to that imposed by *Brady,* in juvenile delinquency proceedings*); see also Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) (due process entitles an accused, upon request, to evidence known to the state that is favorable to the accused and is material to either guilt or punishment); *United States v. Bagley*, 473 U.S. 667, 676, 105 S.Ct. 3375 87 L.Ed.2d 481(1985), ("Impeachment evidence, as well as exculpatory evidence, falls within the *Brady* rule.").

{¶78} The CCDCFS records at issue are confidential under R.C. 5153.17 and 2151.421(H)(1). However, this confidentiality is not absolute. *State ex rel. Renfro v. Cuyahoga Dept. of Human Services*, 54 Ohio St.3d 25, 29, 560 N.E.2d 230 (1990); *State v. Sahady,* 8th Dist. Cuyahoga No. 83247, 2004-Ohio-3481, ¶ 29, citing *Child Care Provider Certification Dept. v. Harris*, 8th Dist. Cuyahoga No. 82966, 2003-Ohio-6500, ¶ 11; *Johnson v. Johnson*, 134 Ohio App.3d 579, 583, 731 N.E.2d 1144 (3d Dist.1999).

Where the records are necessary and relevant to a proceeding and good cause is shown for disclosure, "access to the records may be warranted." *Sahady* at ¶ 32.

**{¶79}** In *Pennsylvania v. Ritchie*, 480 U.S. 39, 107 S.Ct. 989, 94 L.Ed.2d 400 (1987), the United States Supreme Court resolved the conflict between the confidentiality afforded children's services records and a defendant's right of access to information material to his defense by holding that a criminal defendant's due process right to a fair trial entitled him to an in camera review by the trial court of the children's services records to determine whether the records contained evidence material to the defendant's defense. *Id.* at 57-58; *see also State v. Branch*, 3d Dist. Allen No. 1-12-44, 2013-Ohio-3192, ¶ 85; *State v. Meadows,* 4th Dist. Scioto No. 99CA2651, 2001 Ohio App. LEXIS 3120, *27-29 (Feb. 12, 2001) (where criminal defendant made a specific request for children's services records that he believed would likely contain exculpatory evidence or information that could be used for impeachment purposes, trial court was required to conduct an in camera inspection of those documents to determine if they contained evidence material to his defense); *State v. Elliott*, 5th Dist. Tuscarawas No. 2007AP070044, 2008-Ohio-5673, ¶ 29 (where criminal defendant made a specific request for records that were confidential under R.C. 5153.17, "trial court would be required to conduct an in camera inspection of those documents to determine if they contained evidence material to the defense").

**{¶80}** As this court has explained:

> The proper procedure for determining the availability of such records is for the trial court to conduct an in camera inspection to determine the

following: (1) whether the records are necessary and relevant to the pending action; (2) whether good cause has been shown by the person seeking disclosure; and (3) whether their admission outweighs the confidentiality considerations set forth in R.C. 5153.17 and R.C. 2151.421(H)(1). *Johnson*, 134 Ohio App.3d at 585.

"In determining whether 'good cause' has been shown, the consideration is whether it is in the 'best interests' of the child, or the due process rights of the accused are implicated. *See Johnson*, 134 Ohio App.3d at 583; 1991 Ohio Atty.Gen.Ops. No. 91-003. In order to protect the due process rights of the accused, access to the CCDCFS's * * * investigation records may be required when the records are material to the defense or fair trial considerations are at stake. *See State v. Renfro*, 54 Ohio St.3d 25, 29, 560 N.E.2d 230 (1990); *State v. Meadows*, Scioto App. No. 99CA2651, [2001 Ohio App. LEXIS 3120 (Feb. 12, 2001)]; 1991 Ohio Atty.Gen.Ops. No. 91-003."

*Sahady,* 8th Dist. Cuyahoga No. 83247, 2004-Ohio-3481, ¶ 28-31, quoting *Harris*, 2003-Ohio-6500, at ¶ 11-13.

**{¶81}** Thus, where, as here, a request is made for confidential documents that may contain information material to the defense of an accused, the trial court must balance the due process rights of an accused against the privacy rights at issue.[4] The trial court must examine the documents, in camera, to determine if they contain evidence material to the defense of the accused. *Ritchie* at 58-61; *Sahady* at ¶ 29. Evidence is "material" to a defendant's defense if there is "'a reasonable probability that had the

---

[4]As the court noted in *Ritchie*, a defendant may not require a trial court to search through confidential records "without first establishing a basis for his claim that it contains material evidence." *Ritchie* at 58, fn. 15; *see also State v. Abernathy*, 10th Dist. Franklin No. 94APA03-356, 1994 Ohio App. LEXIS 4382, *2-6 (Sept. 29, 1994) (trial court did not err in refusing to conduct a pretrial in camera inspection of assault victim's children's services records because defendant's request was overly broad and counsel failed to demonstrate relevance of records). In this case, however, we believe C.A.'s counsel made a sufficient showing that the requested CCDCFS records could contain relevant information material to his defense.

evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Ritchie* at 57, quoting *Bagley*, 473 U.S. at 682, 105 S.Ct. 3375, 87 L.Ed.2d 481. A "reasonable probability" is "'a probability sufficient to undermine confidence in the outcome.'" *Ritchie* at 57, quoting *Bagley* at 682.

**{¶82}** "A defendant's right to discover exculpatory evidence" does not, however, include the "unsupervised authority" to review such records (or to have his counsel review such records) to "make the determination as to the materiality of the information." *Ritchie* at 59-60; *see also State v. Stiles*, 3d Dist. Allen No. 1-08-12, 2009-Ohio-89, ¶ 32 ("To ensure a fair trial, a defendant has a right to an in camera review of child abuse records. * * * However, [the defendant] does not have a right, even through counsel, to inspect the records himself."); *In re J.W.*, 9th Dist. Lorain No. 10CA009939, 2011-Ohio-3744, ¶ 15 (defendant had no right to participate in juvenile court's in camera review of mental health records to determine whether they were material and favorable to juvenile's defense in delinquency adjudication). The defendant may have access to the information only if the trial court concludes that it "probably would have changed the outcome of his trial." *Ritchie* at 58.

**{¶83}** The record reflects that the juvenile court failed to follow the proper procedure in this case. Here, C.A. made a specific request for CCDCFS records related to the incident at issue. The request was not overly broad, but rather, sought only those documents that could arguably be relevant to the proceeding. The juvenile court granted CCDCFS's motion to quash without explanation and without reviewing the documents.

**{¶84}** The state argues that C.A.'s due process rights were not violated because "any potentially inconsistent statements contained in the child protective services records would have been cumulative in nature and thus cannot give rise to a *Brady* violation." However, the fact that C.A. had already obtained a police report that contained certain purported inconsistent statements by M.M. and was able to use that report and the statements contained therein when cross-examining M.M. and others at the adjudicatory hearing, does not mean that C.A. was not also entitled to other documents he requested that contained evidence material to his defense. Whether the CCDCFS records at issue contained such evidence could be determined only by reviewing the documents in question, which the juvenile court failed to do.

**{¶85}** Thus, the juvenile court abused its discretion in granting CCDCFS's motion to quash without first reviewing the CCDCFS documents in camera to see if they contained evidence material to C.A.'s defense. *Ritchie*; *see also D.M.*, 140 Ohio St.3d 309, 2014-Ohio-3628, 18 N.E.3d 404, at ¶ 16 ("when the state or the juvenile claims that documents are privileged or otherwise not discoverable, it is an abuse of discretion for the juvenile court not to perform an in camera inspection of the documents to determine whether they contain discoverable evidence * * * ").

**{¶86}** The CCDCFS records are not part of the record on appeal. Without reviewing the records, we are unable to determine whether the juvenile court's failure to conduct an in camera inspection prejudiced C.A. We, therefore, remand the case so that the juvenile court may examine the CCDCFS records in camera and determine if the

records contain evidence material to C.A.'s defense, i.e., information that probably would have changed the outcome of the proceedings. If the records contain no such information or if the juvenile court determines that the nondisclosure was harmless beyond a reasonable doubt, the juvenile court is instructed to enter such a finding. If the juvenile court determines that the records contain evidence that with reasonable probability would have affected the outcome of the proceedings, the juvenile court is instructed to vacate the adjudication and disposition and order a new trial. *See Ritchie* at 57-58; *State v. Fuson*, 5th Dist. Knox No. 97 CA 000023, 1998 Ohio App. LEXIS 4047, *5-7 (Aug. 11, 1998).

**{¶87}** C.A.'s first assignment of error is sustained.

**{¶88}** Judgment affirmed in part, matter remanded for further proceedings consistent with this opinion.

It is ordered that appellant recover from appellee the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
EILEEN A. GALLAGHER, JUDGE

LARRY A. JONES, SR., P.J., and

ANITA LASTER MAYS, J., CONCUR