[Cite as *State v. Kelley*, 2024-Ohio-157.]

**COURT OF APPEALS OF OHIO**

**EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA**

STATE OF OHIO,                                   :

    Plaintiff-Appellee,            :

                                    No.  111994

    v.                                            :

JOVAN KELLEY,                                    :

    Defendant-Appellant.           :

---

JOURNAL ENTRY AND OPINION

**JUDGMENT:**  AFFIRMED IN PART, VACATED IN PART,
                    AND REMANDED IN PART
**RELEASED AND JOURNALIZED:**  January 18, 2024

---

Criminal Appeal from the Cuyahoga County Court of Common Pleas
Case No. CR-21-659964-A

---

*Appearances:*

Michael C. O'Malley, Cuyahoga County Prosecuting Attorney, and Kerry Sowul, Assistant Prosecuting Attorney, *for appellee*.

Joseph V. Pagano, *for appellant*.

MICHAEL JOHN RYAN, J.:

{¶ 1} Defendant-appellant, Jovan Kelley, appeals from his judgment of conviction on several sexually oriented offenses and sexually violent predator specifications, which were rendered after a bench trial.  After a thorough review of

the facts and pertinent law, we affirm the findings of guilt, vacate the portion of the trial court's judgment imposing postrelease control, and remand the case to the trial court for the limited purpose of resentencing relative to postrelease control and the issuance of an appropriate judgment entry.

**Procedural History**

{¶ 2} In 2021, Kelley was charged in an eight-count indictment with five counts of gross sexual imposition (Counts 1 through 5) and three counts of rape (Counts 6-8) relative to two victims, J.J. and J.G. Each count contained a sexually violent offender specification.

{¶ 3} In May 2022, Kelley filed a motion for an order to direct Frontline Services ("Frontline") to release all relevant records regarding mental health treatment received by one of the victims, J.J., for an in camera inspection. As grounds for the motion, defense counsel asserted that he believed the records were "crucial to the defense and may provide exculpatory information." The state opposed the motion on the grounds that the records (1) were privileged, (2) not within its possession, and (3) were not contemplated by Crim.R. 16. The trial court summarily denied Kelley's motion.

{¶ 4} After Kelley waived his right to a jury trial, the case proceeded to a bench trial in August 2022. After certain testimonies, the state requested to amend the indictment to change the form of the sexual conduct and change the dates of the crimes. The trial court granted the state's request.

**{¶ 5}** The defense renewed its request for production of the Frontline records after the testimony of the victims' mother; the trial court again denied the request.

**{¶ 6}** At the close of state's evidence, the defense made a Crim.R. 29 motion for judgment of acquittal. In response, the state dismissed Count 7, rape of J.G. The trial court denied the motion as to the remaining counts. The defense did not present any witnesses.

### Facts as Elicited at Trial

**{¶ 7}** The victims — J.J. and J.G. — are sisters. During the relevant period of time, their mother was dating Kelley. The abuse began in 2018, when J.J. was 11 years old and J.G. was nine years old and spanned an approximate eight-month period. Thus, at all relevant times the victims were under the age of 13.

**{¶ 8}** The victims' mother started dating Kelley in early 2018. Approximately six months after they started dating, Kelley moved into the house in Cleveland where mother, J.J., and J.G. lived. Both victims initially got along with Kelley.

**{¶ 9}** Kelley's relationship with the girls changed in the fall of 2018, however. J.J. testified that Kelley would allow her to use an old cell phone of his to make Tik-Tok videos. On one particular occasion in the fall of 2018 when J.J. asked Kelley for his phone, Kelley, who was laying down on a couch in the living room with a thin sheet over him, told J.J. that she could use the phone if she massaged his "hand." The air conditioner was on in the house, and Kelley told J.J. his hand was

cold.  J.J. agreed to give Kelley the massage.  Kelley's hands remained covered by the sheet.

{¶ 10} While giving the massage, J.J. realized that she was massaging Kelley's penis, not his hand.  J.J. tried to move her hand "up" so that it would not be touching Kelley's penis, but Kelley moved it back "down."  J.J. testified that she was certain she was massaging Kelley's penis because she knows what a hand feels like and what she was massaging had a different feel.  J.J. further testified that Kelley set a timer for the massage and if she stopped massaging, he would add more time.

{¶ 11}  J.J. testified that a second incident occurred in the spring of 2019, and was much like the first incident, with Kelley telling her she could use his cell phone if she massaged his "hand."  As with the first incident, Kelley had his hands under a sheet.  J.J. testified that she knew she was massaging his penis because she could see Kelley's penis "[t]hrough the imprint on the sheet."

{¶ 12} A third incident happened the following day, and as with the two other incidents was preceded by J.J.'s request to use Kelley's phone.  J.J. testified that Kelley did not have a sheet on or covering him during this incident, but he was wearing shorts, and she massaged his penis over his shorts.  And during this incident, Kelley's hands were clasped and on his chest.

{¶ 13} When the third massage was over, J.J. had a conversation in the bathroom with her sister, J.G.  After this conversation, she "realized that [she] was right about what [she] thought [she] was really massaging."

**{¶ 14}** J.G. testified that her relationship with Kelley began to change when she felt that Kelley was invading her privacy. J.G. testified, for example, about an incident where Kelley found her journal and turned it over to her mother.

**{¶ 15}** J.G. testified that Kelley also had sexual encounters with her, the first occurring in the fall of 2018, when Kelley asked her to massage his "hand." On that occasion, J.G. and Kelley were in the living room watching a movie. They were both on the couch — Kelley was lying down with a blanket over his stomach and legs and J.G. was seated by his side.

**{¶ 16}** J.G. started to massage Kelley's "hand" over the top of the blanket but realized that what she was massaging did not "feel like a hand," rather it felt "squishy." According to J.G., Kelley's hand was directly on his penis, and she was massaging his penis. J.G. testified that as she massaged Kelley's penis, Kelley "had his head back with his eyes closed" and made several "grunts."

**{¶ 17}** J.G. testified that the "same thing" happened a week or two later. This time, Kelley called J.G. to the living room to watch a movie with him. Kelley had a blanket covering him and asked J.G. to massage his "hand." J.G. testified that Kelley's hand was "where a man's penis is" and she massaged his penis over the blanket. After this second incident, J.G. researched "how to do a hand job" to determine if that was what she was doing when she gave Kelley the massages.

**{¶ 18}** J.G. also testified that the massages occurred on two other occasions, but she was unable to give details about the circumstances surrounding them. She mentioned these other massages for the first time during the trial.

{¶ 19} J.G. corroborated J.J.'s testimony about the conversation the two had in the bathroom. A day or two after that conversation, J.J., J.G., their mother, and Kelley went to a restaurant to pick up a carry-out order. Their mother went into the restaurant to pick up the order, while the victims and Kelley stayed in the car. The two victims confronted Kelley about the massages. Kelley denied the accusations and told the girls that they were going to tell their mother what they were accusing him of when she returned.

{¶ 20} Upon the mother's return to the car, J.J. disclosed to her mother that Kelley had been having her massage his penis in exchange for use of his cell phone. Mother, Kelley, and the girls went home, at which time mother contacted her mother or the victims' maternal grandmother. The grandmother came to the home, and the victims disclosed the abuse to her.

{¶ 21} Because of their professional pursuits, both mother and grandmother were bound as mandatory reporters of alleged sexual abuse. Neither one reported the abuse the girls had disclosed to them at that time, however. Mother had Kelley leave her house for a period of time.

{¶ 22} Mother allowed Kelley to come back to her home approximately one month later. Mother requested that Kelley apologize to the girls. J.G. testified that Kelley told them he would never do what they had accused him of because he had sisters. Mother's relationship with her daughters deteriorated around this time.

{¶ 23} J.G. testified that after Kelley returned to their house, he raped her one evening. According to J.G., she, her mother, and Kelley were watching a movie

in the living room. J.G. remembered that she was wearing "Strawberry Shortcake" pajama bottoms. Her mother, who J.G. described as a heavy sleeper, was asleep. J.G. started to doze off but was awakened by a pain in her lower back. She described the pain as coming from her "butt." J.G. turned around and saw Kelley "right there," standing over her with his "two hands * * * on both of [her] sides." J.G. testified that while Kelley was standing over her, she felt pain "in [her] butt." J.G. initially thought the pain was from dance activities that she had been involved in at the time and dismissed it.

{¶ 24} The next morning when J.G. woke up, she was still suffering from pain in her "butt." J.G. went to the bathroom and discovered that she was bleeding, but she was not menstruating. J.G. testified that she bled for several days and was in pain for several weeks.

{¶ 25} In the spring of 2019, there was a fire in the house where the victims, their mother, and Kelley had been living, which caused them to move into the grandmother's house in Cleveland Heights. According to mother, Kelley was "distant" from the family during this time.

{¶ 26} J.G. testified to another rape that occurred in August 2019. On that occasion, J.G. was playing a video game in her mother's room. She was on her mother's bed, and Kelley was lying on the bed with her. J.G. testified that she was wearing "baggy" shorts and she "felt something trying to get into [her] pants." The "something" was Kelley's hand; he was able to get his hand into J.G.'s shorts and put his finger "where a baby comes out."

{¶ 27} One day in August 2019, Kelley drove mother to the hairdresser. When Kelley returned to get mother, he informed her that there had been a "big blow up." Mother later learned that J.J. and J.G. had disclosed the abuse to her brother, the girls' uncle. Kelley subsequently moved out of the Cleveland Heights home.

{¶ 28} In January 2020, mother took J.J. to Frontline after J.J. returned home from an out-of-state trip. At Frontline, J.J. made disclosures about something that happened on her trip as well as the allegations about Kelley. Frontline transferred J.J. to a hospital, where she gave more details about the incidents with Kelley. The medical records from the hospital, which were provided to the defense during discovery, reference J.J.'s disclosures about Kelley made at Frontline.

{¶ 29} On this testimony, the trial court found Kelley guilty of the remaining counts and specifications. At sentencing, the court imposed a prison term of two years to life on Counts 1-5 (gross sexual imposition); and life without parole on Counts 6 and 8 (rape). The trial court ordered all counts to be served consecutively. The court advised Kelley of his duties to register as a sex offender pursuant to R.C. 2950.032 and classified him as a Tier III sex offender. Although the trial court's judgment of conviction provides postrelease-control advisements, the trial court failed to so advise Kelley at the sentencing hearing.

**Assignments of Error**

I. Appellant's Fifth, Sixth, and Fourteenth Amendment rights and Art. I, Sec. 10 of the Ohio Constitution were violated where relevant and potentially exculpatory records from Frontline were

not disclosed to defense counsel due to the trial court's denial of counsel's motion to compel them or due to the failure to properly secure their production.

II. The trial court erred when it denied appellant's motion for acquittal under Crim.R. 29 because the state failed to present sufficient evidence to establish beyond a reasonable doubt the elements necessary to support the convictions.

III. Appellant's convictions are against the manifest weight of the evidence.

IV. Appellant was denied a fair trial and effective assistance of counsel where the State was improperly permitted to lead its witnesses.

V. The court erred by allowing several amendments to the indictment following trial and over appellant's objection.

VI. The record is insufficient to support the court's conclusory findings regarding the sexual violent predator specifications.

VII. The court erred by imposing postrelease control in its sentencing journal entry when it was not done in open court.

**Law and Analysis**

**No Abuse of Discretion in Denying the Motion to Compel**

{¶ 30} In his first assignment of error, Kelley contends that the trial court erred in denying his motion to compel J.J.'s mental health records from Frontline. We disagree.

{¶ 31} An appellate court generally reviews a trial court's judgment on discovery matters for an abuse of discretion. *Wall v. Ohio Permanente Med. Group Inc.*, 119 Ohio App.3d 654, 661, 695 N.E.2d 1233 (8th Dist.1997). However, a trial court's interpretation of law governing privileged matters is a question of law that

we review de novo review. *Ward v. Summa Health Sys.*, 128 Ohio St.3d 212, 2010-Ohio-6275, 943 N.E.2d 514, ¶ 13, citing *Med Mut. of Ohio v. Schlotterer*, 122 Ohio St.3d 181, 2009-Ohio-2496, 909 N.E.2d 1237. The appropriate standard of review depends on whether the asserted privilege presents a question of law or a question of fact. *Randall v. Cantwell Mach. Co.*, 10th Dist. Franklin No. 12AP-786 2013-Ohio-2744, ¶ 9. When interpreting statutory language to determine if requested information is privileged, we apply a de novo standard of review. *Id.* When the claimed privilege requires review of factual questions, an abuse-of-discretion standard applies. *Id.*

{¶ 32} J.J.'s mental health records are privileged[1] — Kelley has not disputed as much. Thus, our review here involves factual questions and therefore is under the abuse-of-discretion standard. An abuse of discretion "has been described as including a ruling that lacks a 'sound reasoning process.'" *State v. Morris*, 132 Ohio St.3d 337, 2012-Ohio-2407, 972 N.E.2d 528, ¶ 14, quoting *AAAA Ents., Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161, 553 N.E.2d 597 (1990). This is "a deferential review," and "[i]t is not sufficient for an appellate court to determine that a trial court abused its discretion simply because the appellate court might not have reached the same conclusion or is, itself, less persuaded by the trial court's reasoning process than by the countervailing arguments." *Morris* at *id.*, citing *AAAA Ents., Inc.* at *id.*

---

[1] *See* R.C. 2317.02 and 4732.19.

{¶ 33} Kelley filed a motion to compel in camera inspection of mental health records regarding treatment victim J.J. received at Frontline. In his motion, Kelley contended that "the records are crucial to the defense and may provide exculpatory information." Kelley did not offer a basis for his claim. The state opposed the motion, contending that the (1) records were not in its possession, (2) records were privileged, and (3) discovery of the records was not contemplated by Crim.R. 16. The trial court summarily denied Kelley's motion.

{¶ 34} Under Crim.R. 16, which governs discovery in criminal cases, the state is required to

> provide copies or photographs, or permit counsel for the defendant to copy or photograph, the following items related to the particular case indictment, information, or complaint, and which are material to the preparation of a defense, or are intended for use by the prosecuting attorney as evidence at the trial, or were obtained from or belong to the defendant, *within the possession of, or reasonably available to the state*, subject to the provisions of this rule: (3) Subject to divisions (D)(4) and (E) of this rule, all laboratory or hospital reports, books, papers, documents, photographs, tangible objects, buildings, or places; (4) Subject to division (D)(4) and (E) of this rule, results of physical or mental examinations, experiments or scientific tests[.]

(Emphasis added.) Crim.R. 16(B)(3) and (4).

{¶ 35} In regard to sexual assault cases, Crim.R. 16 provides as follows:

> In cases of sexual assault, defense counsel, or the agents or employees of defense counsel, shall have the right to inspect photographs, results of physical or mental examinations, or hospital reports, *related to the indictment*, information, or complaint as described in section (B)(3) or (B)(4) of this rule.

(Emphasis added.) Crim.R. 16(E).

{¶ 36} The trial testimony revealed that J.J. went to Frontline because she was suicidal. Thus, the treatment J.J. received at Frontline was not relative to the sexual abuse allegations, rather, it was for mental health treatment due to her suicidal ideation. This court considered the same scenario in *State v. Brown*, 8th Dist. Cuyahoga No. 86544, 2006-Ohio-2573. In *Brown*, while receiving treatment for a drug overdose, the victim disclosed that she had been raped four months prior. A criminal investigation and charges ensued as a result of the victim's disclosure. During discovery, the defendant sought access to the victim's medical records generated as a result of treatment for the overdose. The trial court denied the defendant's request.

{¶ 37} This court affirmed, finding no Crim.R. 16 violation. The *Brown* Court reasoned that "[t]he documents in question clearly were the result of a treatment for a drug overdose"; they were not generated in connection with the sexual assault case. *Id.* at ¶ 54. Moreover, no sexual assault examination occurred, and the state did not offer medical evidence relating to the sexual assault that was derived from the victim's overdose treatment.

{¶ 38} Likewise, here, J.J. made disclosures about Kelley's abuse while being treated for suicidal ideation at Frontline. The treatment J.J. received at Frontline was not for the sexual assaults. Moreover, the state did not offer medical evidence relating to the sexual assaults that was derived from J.J.'s mental health treatment at Frontline.

{¶ 39} We further note that, although the substance of Kelley's motion requested that Frontline produce the records, the motion was not sent to Frontline. Rather, it was sent to the state, and it was the state that opposed it, in part, because the records were not in its possession. A defendant "is not entitled to records that are not in the possession, custody or control of the State." *State v. Bolling*, 2d Dist. Montgomery No. 20225, 2005-Ohio-2509, ¶ 56, citing *State v. Boehm*, 2d Dist. Montgomery No. 16335, 1997 Ohio App. LEXIS 6128 (Dec. 31, 1997); *see also State v. Primeau*, 8th Dist. Cuyahoga No. 97901, 2012-Ohio-5172, ¶ 51 (Crim.R. 16 "does not require the State to obtain items requested by the defense that the State does not already possess.").

{¶ 40} Indeed, after the defense's renewal of its motion to compel at trial, the state reiterated that it could not provide the records because they were not in its possession. The defense arguably conceded the state's position:

> The State replied [to the motion to compel] * * * [that] the records were not in their possession. There's no ability or obligation to turn them over. So I didn't previously object to the Court's ruling. Just ask for the opportunity to preserve it now in light of what we learned [from mother's testimony] * * * potentially could have been exculpatory evidence.

Tr. 259.

{¶ 41} Our review of the mother's testimony does not provide a ground for release of the records. Specifically, mother testified that the disclosure of the "greater detail" of the abuse occurred at the hospital when J.J. was interviewed by the police, not at Frontline. And mother admitted that J.J. had previously told her

about the abuse prior to J.J. going to Frontline and the hospital. When questioned by the defense if what J.J. had previously disclosed to her was different from what J.J. disclosed at the hospital, mother testified, "It wasn't different, it was just further detail. It was the same thing. I didn't know the extent of what she said that night." Thus, Kelley's contention that "it became evident during trial testimony that these records may have included exculpatory evidence" is belied by mother's testimony.

{¶ 42} Thus, the record demonstrates that the details of the allegations were revealed at the hospital, not at Frontline. Further, J.J.'s medical records provided to the defense during discovery were replete with the information disclosed at Frontline, and the disclosures in the medical records are almost identical to J.J.'s trial testimony.

{¶ 43} The United States Supreme Court has held that, under certain circumstances, a defendant is entitled to have confidential records reviewed in camera by the trial court. *Pennsylvania v. Ritchie*, 480 U.S. 39, 58, 107 S.Ct. 989, 94 L.Ed.2d 40 (1987). However, the Court also held that a defendant may not require the trial court to search through confidential records "without first establishing a basis for his [or her] claim that it contains material evidence." *Id.* at 58, fn. 15.

{¶ 44} We are not persuaded by Kelley's citation to *In re C.A.*, 8th Dist. Cuyahoga No. 102675, 2015-Ohio-4768, for the proposition that the trial court should have conducted an in camera inspection of the Frontline records. At issue in *In re C.A.*, were records from the Cuyahoga County Division of Children and Family

Services ("CCDCFS") "relating to the *subject incident*." (Emphasis added.) *Id.* at ¶ 75. And a police report obtained by the juvenile delinquent "contained certain purported inconsistent statements" by the victim. *Id.* at ¶ 84. On that record, this court found that the trial court abused its discretion by granting the state's motion to quash the subpoena without first conducting an in camera review of the agency documents.

{¶ 45} Similar to the juvenile in *In re C.A.*, Kelley subpoenaed the victims' records from CCDCFS, requesting "all records related to any investigation * * * related to alleged incidents of sexual assault." The state filed a motion to quash, which the trial court denied, thus granting Kelley access to those records after an in camera inspection. The Frontline records were distinguishable because they were relative to J.J.'s mental health treatment, not treatment she sought for the sexual assaults.

{¶ 46} Further, *In re C.A.* does not stand for the proposition that whenever a defendant seeks records, they are automatically subject to being turned over for an in camera review. This court noted the balancing of the competing interests that must take place — the due process rights of the accused versus a victim's privacy rights. On the record presented in *In re C.A.*, the panel found that the juvenile delinquent's "counsel made a sufficient showing that the requested CCDCFS records could contain relevant information material to his defense." *Id.* at ¶ 81, fn. 4.

{¶ 47} In this case, Kelley failed to make a sufficient showing that the Frontline records contained any material or exculpatory evidence. The trial court

did not abuse its discretion in denying Kelley's motion to compel without an in camera inspection. The first assignment of error is therefore overruled.

**The Evidence was Sufficient to Support the Convictions**

{¶ 48} In his second assignment of error, Kelley contends that the trial court erred in denying his Crim.R. 29 motion for judgment of acquittal because the evidence was insufficient to support his convictions.

{¶ 49} Crim.R. 29(A) provides that a court "shall order the entry of the judgment of acquittal of one or more offenses * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." "Because a Crim.R. 29 motion questions the sufficiency of the evidence, '[w]e apply the same standard of review to Crim.R. 29 motions as we use in reviewing the sufficiency of the evidence.'" *Fairview Park v. Peah*, 8th Dist. Cuyahoga No. 110128, 2021-Ohio-2685, ¶ 37, quoting *State v. Tenace*, 109 Ohio St.3d 255, 2006-Ohio-2417, 847 N.E.2d 386, ¶ 37.

{¶ 50} Where a party challenges the sufficiency of the evidence supporting a conviction, a determination of whether the state has met its burden of production at trial is conducted. *State v. Hunter*, 8th Dist. Cuyahoga No. 86048, 2006-Ohio-20, ¶ 41, citing *State v. Thompkins*, 78 Ohio St.3d 380, 678 N.E.2d 541 (1997). An appellate court reviewing sufficiency of the evidence must determine "'whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt.'" *State v. Leonard*, 104 Ohio St.3d 54, 2004-Ohio-6235, 818 N.E.2d 229, ¶ 77, quoting *State v. Jenks*, 61 Ohio St.3d 259, 574 N.E.2d 492 (1991),

paragraph two of the syllabus. With a sufficiency inquiry, an appellate court does not review whether the state's evidence is to be believed but whether, if believed, the evidence admitted at trial supported the conviction. *State v. Starks*, 8th Dist. Cuyahoga No. 91682, 2009-Ohio-3375, ¶ 25, citing *Thompkins* at 387. A sufficiency of the evidence argument is not a factual determination, but a question of law. *Id.*

{¶ 51} Kelley first contends that the evidence was insufficient to support the two counts of rape of J.G. We disagree.

{¶ 52} Kelley was charged in Counts 6 and 8 with rape in violation of R.C. 2907.02(A)(1)(b), which provides that "[n]o person shall engage in sexual conduct with another who is not the spouse of the offender * * * when * * * [t]he person is less than thirteen years of age, whether or not the offender knows the age of the other person." Sexual conduct is "the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another." R.C. 2907.01(A). Ohio courts have consistently held that a victim's testimony alone is sufficient to support a rape conviction. *State v. Blankenship*, 8th Dist. Cuyahoga No. 77900, 2001 Ohio App. LEXIS 5520, 11 (Dec. 13, 2001). "There is no requirement that a rape victim's testimony be corroborated precedent to conviction." (Citation omitted.) *Id.*

{¶ 53} At all relevant times, J.G. was under 13 years old. The testimony relative to the first rape was that J.G., her mother, and Kelley were watching a movie in the living room. Her mother, a heavy sleeper, was asleep. J.G. started to doze off but was awakened by a pain in her lower back. She described the pain as coming

from her "butt." J.G. turned around and saw Kelley "right there," standing over her with his "two hands * * * on both of [her] sides." J.G. testified that while Kelley was standing over her, she felt pain "in [her] butt."

{¶ 54} The next morning when J.G. woke up, she was still suffering from pain in her "butt." J.G. went to the bathroom and discovered that she was bleeding, but she was not menstruating. J.G. testified that she bled for several days and was in pain for several weeks.

{¶ 55} This testimony was sufficient to support anal rape. A rational finder of fact could determine that, Kelley standing over J.G. with his hands on either side of her, while she experienced pain in her "butt" that persisted for weeks and caused her to bleed for days, created a reasonable inference that Kelley anally penetrated J.G.

{¶ 56} In regard to the second rape, J.G. was playing a video game in her mother's room. She was on her mother's bed, and Kelley was lying on the bed with her. J.G. testified that she was wearing "baggy" shorts and she "felt something trying to get into [her] pants." The "something" was Kelley's hand; he was able to get his hand into J.G.'s shorts and his finger went inside "where a baby comes out." A "rape victim's testimony that an offender inserted his finger inside [the victim's] vagina is sufficient evidence of penetration." *State v. Roberts*, 1st Dist. Hamilton No. C-040547, 2005-Ohio-6391, ¶ 64.

{¶ 57} Kelley contends that the evidence was insufficient because the state asked leading questions to elicit J.G.'s testimony and because there were some

inconsistencies in the victim's testimony. In regard to the leading nature of the state's questions, as will be discussed in more detail in addressing the fourth assignment of error, such questioning is permissible of a child victim. And in regard to Kelley's contention about inconsistencies in J.G.'s testimony, that is an issue of credibility, which is not part of a sufficiency analysis. *See, e.g., State v. D.S.*, 8th Dist. Cuyahoga No. 109346, 2021-Ohio-1725, ¶ 42 ("[C]redibility is not a factor in the sufficiency analysis.").

{¶ 58} On the record before us, the evidence was sufficient to support the rape convictions.

{¶ 59} In regard to the gross sexual imposition convictions, Kelley was charged under R.C. 2907.05, which provides in pertinent part that

> [n]o person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender * * * when * * * [t]he other person * * * is less than thirteen years of age, whether or not the offender knows the age of that person.

R.C. 2907.05(A)(4).

{¶ 60} Sexual contact means "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." R.C. 2907.01(B). "'[T]here is no requirement that there be direct testimony regarding sexual arousal or gratification.'" *In re J.A.*, 8th Dist. Cuyahoga No. 111743, 2023-Ohio-222, ¶ 28, quoting *In re D.W.*, 8th Dist. Cuyahoga No. 110960, 2022-Ohio-1407, ¶ 23. "'The purpose of the contact may be inferred from the type, nature,

and circumstances of the contact.'" *In re J.A.* at *id.*, quoting *In re D.W.* at *id.* This court has found sufficient evidence to establish sexual contact for a gross sexual imposition on a victim's testimony that the defendant had the victim "touch and squeeze" his penis. *See State v. Tate*, 8th Dist. Cuyahoga No. 98221, 2013-Ohio-370, ¶ 21.

{¶ 61} The state presented sufficient evidence to support the gross sexual imposition convictions. It is undisputed that J.J. and J.G. were under 13 years old when the crimes occurred. J.J. testified that Kelley had her massage his penis three times — twice over a blanket and the third time over his shorts. Likewise, J.G. testified that Kelley made her massage his penis on four occasions.

{¶ 62} In his brief, Kelley emphasizes that trial was the first time J.G. told of a total of four massages for the first time during the trial. That is true; but Kelley was only charged with two counts of gross sexual imposition relative to J.G. Further, the matter was tried to the bench, not a jury. In a bench trial, the trial judge is presumed to know the law and to consider only the relevant, material, and competent evidence in arriving at a decision. *See State v. Bays*, 87 Ohio St.3d 15, 26-27, 716 N.E.2d 1126 (1999). The testimony about the two unindicted massages did not contribute to the two gross sexual imposition convictions relative to J.G.

{¶ 63} J.G. testified in detail to the two indicted charges, which involved watching a movie with Kelley, who had a blanket covering him, and who had her massage his penis under the blanket. J.G.'s testimony provided sufficient evidence

to support the two counts of gross sexual imposition relative to Kelley's sexual contact with J.G.

{¶ 64} On this testimony, the evidence was sufficient to support the five counts of gross sexual imposition. The second assignment of error is overruled.

**The Convictions were not Against the Manifest Weight of the Evidence**

{¶ 65} In his third assignment of error, Kelley challenges his convictions as being against the weight of the evidence.

{¶ 66} A manifest weight challenge questions the credibility of the evidence presented and examines whether the state met its burden of persuasion at trial. *State v. Whitsett*, 8th Dist. Cuyahoga No. 101182, 2014-Ohio-4933, ¶ 26, citing *Thompkins*, 78 Ohio St.3d at 387, 678 N.E.2d 541. A reviewing court "weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Martin*, 20 Ohio App.3d 172, 485 N.E.2d 717 (1st Dist.1983), paragraph three of the syllabus. A reversal on the basis that a verdict is against the manifest weight of the evidence is granted "only in the exceptional case in which the evidence weighs heavily against the conviction." *Martin* at *id.*

{¶ 67} In this assignment of error, Kelley advances the same arguments he set forth in his sufficiency challenge. Here is where we can consider his credibility argument. Although we review credibility when considering the manifest weight of

the evidence, we are cognizant that determinations regarding credibility of witnesses and the weight of testimony are primarily for the trier of fact. *See, e.g., State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus; *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). The trier of fact is best able "to view the witnesses and observe their demeanor, gestures and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *Seasons Coal Co., Inc.* at *id.*

{¶ 68} Upon review of the record, this is not the exceptional case in which the trier of fact lost its way. J.J. and J.G. testified to numerous instances of sexual contact and sexual conduct that Kelley engaged in with them. They provided supporting details to their accounts. As the trier of fact, the trial court was in the best position to weigh the evidence and the credibility of J.J. and J.G. and was "entitled to believe or disbelieve all, part, or none" of their testimonies. *In re D.B.*, 8th Dist. Cuyahoga No. 110788, 2022-Ohio-936, ¶ 19. To the extent that there were inconsistencies in their testimony, they did not render their accounts incredible.

{¶ 69} The third assignment of error is overruled.

**Counsel was Not Ineffective for Failing to Object to Leading Questions**

{¶ 70} In his fourth assignment of error, Kelly contends that his counsel was ineffective for not objecting to the state's leading questions posed to the victims.

{¶ 71} The Sixth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution provide that defendants in all criminal proceedings shall have the assistance of counsel for their defense. The United States

Supreme Court has recognized that "the right to counsel is the right to effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 686, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

{¶ 72} To establish ineffective assistance of counsel, a defendant must demonstrate that counsel's performance fell below an objective standard of reasonable performance and that he or she was prejudiced by that deficient performance, such that but for counsel's error, the result of the proceedings would have been different. *State v. Drummond*, 111 Ohio St.3d 14, 2006-Ohio-5084, 854 N.E.2d 1038, ¶ 205, citing *Strickland* at 687-688. Counsel's errors must be so serious as to render the result of the trial unreliable. *State v. Jamie*, 8th Dist. Cuyahoga No. 102103, 2015-Ohio-3583, ¶ 24.

{¶ 73} Under Evid.R. 611 (C), "leading questions should not be used on the direct examination of a witness except as may be necessary to develop the witness' testimony." However, it is within the trial court's discretion to allow leading questions on direct examination. *See* Staff Note, Evid.R. 611(C); *State v. D'Ambrosio*, 67 Ohio St.3d 185, 190, 616 N.E.2d 909 (1993).

{¶ 74} In *State v. Johnson*, 8th Dist. Cuyahoga No. 82340, 2003-Ohio-6634, this court ruled that it is wholly within the trial judge's discretion to permit the state to ask leading questions of its own witness. *Id.* at ¶ 11. Courts have continued to emphasize the latitude given the trial court in such matters, especially in cases involving children who are the alleged victims of sexual offenses. *See State v. Miller*, 44 Ohio App.3d 42, 45, 541 N.E.2d 105 (6th Dist.1988); *State v. Madden*, 15 Ohio

App.3d 130, 133, 472 N.E.2d 1126 (12th Dist.1984); *State v. Matheny*, 5th Dist. Tuscarawas No. 2001 AP070069, 2002-Ohio-1120, ¶ 82-83; *State v. Mader*, 8th Dist. Cuyahoga No. 78200, 2001 Ohio App. LEXIS 3842, 7 (Aug. 30, 2001). Moreover, a defense counsel's failure to object to leading questions during the state's direct examination "will almost never rise to the level of ineffective assistance of counsel." *State v. Wilson*, 8th Dist. Cuyahoga No. 107806, 2019-Ohio-4056, ¶ 29.

{¶ 75} There was no abuse of discretion here in allowing the state to ask leading questions to the child victims. The fourth assignment of error is overruled.

**The Trial Court did not Abuse its Discretion by Allowing the State to Amend the Indictment**

{¶ 76} For his fifth assignment of error, Kelley contends that the trial court erred by allowing the state to amend the indictment.

{¶ 77} Pursuant to Crim.R. 7(D), a trial court may amend an indictment "at any time before, during or after a trial" if "no change is made in the name or identity of the crime charged." The amendment may be to change "any defect, imperfection, or omission in form or substance, or of any variance with the evidence." *Id.* In challenging an amendment to an indictment, a defendant must show not only that the trial court abused its discretion in allowing the amendment, but that the amendment prejudiced his or her defense. *State v. Buchanan*, 2017-Ohio-1361, 88 N.E.3d 686, ¶ 21 (8th Dist.), citing *State v. Beach*, 148 Ohio App.3d 181, 2002-Ohio-2759, 772 N.E.2d 677, ¶ 23 (1st Dist.).

{¶ 78} "A change in the name or identity of a crime charged occurs when the offense alleged in the indictment and the offense alleged in the amended indictment contain different elements that require independent proof." *Buchanan* at ¶ 22. "Amending a rape charge from one type of sexual conduct to another type of sexual conduct changes neither the name nor the identity of the rape offense." *State v. Abdullah*, 10th Dist. Franklin No. 05AP-1316, 2006-Ohio-5412, ¶ 24, citing *State v. Martin*, 10th Dist. Franklin No. 05AP-818, 2006-Ohio-2749, ¶ 9. Furthermore, the date and time of a rape is not an essential element of the offense. *State v. Collinsworth*, 12th Dist. Brown No. CA2003-10-012, 2004-Ohio-5902, ¶ 22.

{¶ 79} The amendments here did not change the name or identity of the crimes charged — they only changed the dates of the offenses and the type of sexual conduct to conform to the testimony. Furthermore, Kelley failed to demonstrate how a change in the indictment dates or type of sexual conduct prejudiced him or significantly altered his defense. Accordingly, the trial court did not abuse its discretion in permitting amendments to the dates and types of sexual conduct to conform to the evidence presented at trial. Kelley's fifth assignment of error is overruled.

**The Sexually Violent Predator Specifications were Supported by Sufficient Evidence**

{¶ 80} In his sixth assignment of error, Kelley challenges the trial court's "conclusory findings" regarding the sexually violent predator specifications. According to Kelley, the trial court found him guilty of the specifications "[w]ithout

any analysis whatsoever" and despite him not having any prior convictions for sexual offenses.

{¶ 81} A sexually violent predator is "a person who, on or after January 1, 1997, commits a sexually violent offense and is likely to engage in the future in one or more sexually violent offenses." R.C. 2971.01(H)(1). R.C. 2971.01(H)(2) provides a list of factors that the trier of fact may consider in determining whether an offender "is likely to engage in one or more sexually violent offenses" in the future. Included in those factors is whether "[a]vailable information or evidence suggests that the person chronically commits offenses with a sexual motivation" and "[a]ny other relevant evidence." R.C. 2971.02(H)(2)(c) and (f). Further, this court has held that "'R.C. 2971.01(H) allows an offender to be classified and sentenced as a sexually violent predator based on the convictions of the underlying offense contained in the indictment.'" *State v. Williams*, 8th Dist. Cuyahoga No. 107748, 2019-Ohio-2335, ¶ 72, quoting *State v. Boynton*, 8th Dist. Cuyahoga No. 93784, 2010-Ohio-4670, ¶ 5.

{¶ 82} Here, the trial court indicated that its judgment in regard to the specifications was based on the trial testimony. Kelley's counsel neither objected nor requested the court to make findings. In *State v. Fisher*, 8th Dist. Cuyahoga No. 90997, 2009-Ohio-476, this court held that a defendant waives his or her challenge to a sexually violent offender specification when he or she does not make a request for findings from the trial court. *Id.* at ¶ 66. "'An appellate court need not consider an error which a party complaining of the trial court's judgment could have called, but did not call, to the trial court's attention at a time when such error could have

been avoided or corrected by the trial court.'" *Id.*, quoting *State v. Williams*, 51 Ohio St.2d 112, 117, 364 N.E.2d 1364 (1977). Because Kelley did not object to the trial court's judgment, or request findings, he has waived this issue on appeal.

{¶ 83} Notwithstanding the waiver, we find that there was sufficient "[a]vailable information or evidence" to suggest that Kelley "chronically commits offenses with a sexual motivation" and "other evidence" under R.C. 2971.02(H)(2)(c) and (f) to support the trial court's finding that Kelley was likely to engage in one or more sexually violent offenses in the future. The record reveals that Kelley abused two young children over an approximate eight-month period. Kelley, who was in a position of trust with the victims, groomed them by rewarding them with use of his cell phone in exchange for their compliance with his sexual requests. Further, Kelley escalated his abuse — from gross sexual imposition to rape — after J.J. and J.G. disclosed the abuse to their mother and grandmother. This evidence was sufficient to support the trial court's judgment on the specifications.

{¶ 84} The fifth assignment of error is overruled.

## The Portion of the Trial Court's Judgment Imposing Postrelease Control is Contrary to Law

{¶ 85} For his final assignment of error, Kelley contends that the trial court erred by imposing postrelease control in its sentencing entry because he was not advised of it at his sentencing hearing. We agree.

{¶ 86} It is well established that a trial court must properly impose postrelease control or that portion of the sentence is invalid. *State v. Grimes*, 151

Ohio St.3d 19, 2017-Ohio-2927, 85 N.E.3d 700, ¶ 8; *State v. Qualls*, 131 Ohio St.3d 499, 2012-Ohio-1111, 967 N.E.2d 718, ¶ 18.  To properly impose postrelease control, the trial court must notify the defendant at the sentencing hearing (1) whether postrelease control is discretionary or mandatory; (2) the length of the postrelease control term; and (3) the consequences for violating postrelease control.  *Grimes* at ¶ 1.  These notifications must also be incorporated into the trial court's sentencing journal entry.  *Id.* at ¶ 1, 13.   Any sentence imposed without postrelease control notifications is contrary to law.  *State v. Jordan*, 104 Ohio St.3d 21, 2004-Ohio-6085, 817 N.E.2d 864, ¶ 23.

{¶ 87} Because the trial court failed to advise Kelley of postrelease control at the sentencing hearing, the portion of its judgment imposing postrelease control is contrary to law.  The sixth assignment of error is sustained.  The portion of the trial court's judgment imposing postrelease control is vacated, and the case is remanded for resentencing for the sole purpose of advising Kelley of postrelease control and reissuing an appropriate judgment.

{¶ 88} Convictions affirmed in part; postrelease control vacated in part; case remanded in part for further proceedings consistent with this opinion.

It is ordered that appellant and appellee share the costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
MICHAEL JOHN RYAN, JUDGE

KATHLEEN ANN KEOUGH, A.J., CONCURS;
EMANUELLA D. GROVES, J., CONCURS IN PART AND DISSENTS IN PART (WITH SEPARATE OPINION)


EMANUELLA D. GROVES, J., CONCURRING IN PART AND DISSENTING IN PART:

{¶ 89} Respectfully, I dissent from the majority's resolution of Kelley's first assignment of error. I find Kelley's argument persuasive and would sustain the error and remand for the trial court to determine if the Frontline records contain material, exculpatory evidence, which would warrant a new trial.

{¶ 90} Although I concur with the majority that no Crim.R. 16 violation occurred, in my view Crim.R. 17, which addresses nonparty subpoenas is the appropriate lens from which to review these facts. Notably, Kelley did not cite which rule he relied on in his motion to compel Frontline to turn over records for in camera review, nor did he specifically cite Crim.R. 17 in his brief. However, Kelley's argument, focusing on violations of his constitutional rights due to the trial court's failure to conduct either an in camera review or evidentiary hearing on his motion, merits consideration under the applicable legal framework. Regardless of the applicable rule, "it is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense." *State ex*

*rel. Thomas v. McGinty*, 2019-Ohio-5129, 137 N.E.3d 1278, ¶ 36 (8th Dist.), quoting *United States v. Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974).

{¶ 91} Specifically, we must address whether Kelley's due process rights were infringed when the trial court denied his motion concerning a nonparty subpoena without conducting either an in camera review or evidentiary hearing. I believe we are required to conduct our analysis of Kelley's constitutional claims using the appropriate rule to determine the merits of his arguments.

{¶ 92} In his motion to compel, Kelley argued the records were crucial to the defense and may provide exculpatory information. On review, both Kelley and the state addressed Crim.R. 16 in their briefs. However, the proper analysis for determining a motion concerning a nonparty subpoena is prescribed by Crim.R. 17 (governing issuance of subpoenas to nonparties in criminal cases) *In re Subpoena Duces Tecum Served upon Potts*, 100 Ohio St.3d 97, 2003-Ohio-5234, 796 N.E.2d 915, and most recently, codified in R.C. 2930.071.[2]

{¶ 93} I concur with the majority that Kelley is not automatically entitled to an in-camera review of records held by a nonparty. He must first overcome his burden of demonstrating that the requested records are material and relevant. "The court's determination of whether a subpoena is unreasonable or oppressive is separate from its decision to conduct an in-camera inspection of documents that the trial court ultimately orders to be filed." *Potts* at ¶ 14.

---

[2] R.C. 2930.071 codified both Crim.R. 16 and Crim.R. 17 effective April 6, 2023.

{¶ 94} The crux of the issue before us is whether the trial court was required to conduct an evidentiary hearing in order for Kelley to offer evidence sufficient to meet his burden. "When deciding a motion to quash a subpoena under Crim.R. 17, the trial court must conduct an evidentiary hearing." *Olmsted Falls v. Bowman*, 8th Dist. Cuyahoga No. 99012, 2014-Ohio-109, ¶ 11, *Potts,* quoting *Nixon*, 418 U.S. 683, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974). A trial court unilaterally determining whether the proponent has met their burden without a hearing deprives the proponent of due process under the law. *Bowman* at ¶ 12.

{¶ 95} Kelley argues that he was denied due process when the court failed to hold an evidentiary hearing and conduct an in camera inspection of Frontline records before denying his motion to compel. The state opposed Kelley's motion to compel Frontline's compliance. The state argued that the records were not in their possession and were privileged, and Crim.R. 16 does not contemplate the discovery of the documents under these facts. The record is silent about why Frontline failed to file a motion to quash the subpoena under Crim.R. 17. However, the trial court effectively quashed the subpoena when it denied Kelley's motion to compel. I would find the trial court erred when it failed to conduct an evidentiary hearing, for two reasons.

{¶ 96} First, the subpoena was directed to Frontline; therefore, Crim.R. 17 is the applicable rule. Crim.R. 16 generally governs discovery between the state and the defense in a criminal matter, but Crim.R. 17 governs subpoenas issued to a nonparty, like Frontline. The rule provides the procedure when a nonparty resists a subpoena. Crim.R. 17(C) states in relevant part:

> A subpoena may also command the person to whom it is directed to produce the books, papers, documents or other objects designated therein; but the court, upon motion made promptly and in any event made at or before the time specified in the subpoena for compliance therewith, may quash or modify the subpoena if compliance would be unreasonable or oppressive.

(Emphasis added.) Crim.R. 17.

{¶ 97} The Ohio Supreme Court adopted the four-step test in *Nixon* to determine whether a subpoena duces tecum is unreasonable or oppressive.

> Under the *Nixon* test, the party moving to compel the production of documents must show:
>
> (1) that the documents are evidentiary and relevant;
> (2) that they are not otherwise reasonably obtainable in advance of trial with due diligence;
> (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and
> (4) that the request is made in good faith and is not merely a fishing expedition.

*Potts* at ¶ 12 (quoting *Nixon* at 699-700), *State v. Hammond*, 4th Dist. Ross No. 18CA3662, 2019-Ohio-4253 at ¶ 13.

{¶ 98} I would find that Kelley's motion to compel triggered a hearing to determine if the subpoena was unreasonable or oppressive, consistent with the *Potts/Nixon* test. Kelley's motion to compel enforcement of the subpoena satisfied the requirement that "the court, *upon motion made promptly, * * ** may quash or modify the subpoena if compliance would be unreasonable or oppressive."

(Emphasis added.) Crim.R. 17(C).

{¶ 99} In this case, the trial court did not conduct a hearing nor make findings considering the *Nixon* test. Accordingly, I would find that the court abused its discretion when it summarily denied Kelley's motion without an evidentiary hearing.

{¶ 100} The second reason I dissent from the majority on Kelley's first assignment of error concerns whether the records are privileged. Once a trial court has determined that the proponent of the motion to compel a subpoena duces tecum has satisfied the *Nixon* test, the court is then required to address any claims of privilege by conducting an in camera review of the relevant records. *Hammond* at ¶ 14. Disputes over whether the information sought in discovery is privileged is a question of law that is reviewed de novo. *Morawski v. Davis*, 8th Dist. Cuyahoga No. 112033, 2023-Ohio-1898, ¶ 8. *Hance v. Cleveland Clinic*, 2021-Ohio-1493, 172 N.E.3d 478, ¶ 25 (8th Dist.) When a trial court does not receive the documents requested and has no opportunity to review them, it cannot determine whether the materials are privileged. *See State v. Boyle*, 8th Dist. Cuyahoga No. 113045, 2023-Ohio-3161, ¶ 29.

{¶ 101} The majority opines that J.J.'s statements to Frontline are privileged under R.C. 2317.02 and 4732.19. I believe the conclusion that the requested records are privileged is unsubstantiated by the record. Neither the state nor the trial court possessed or reviewed the records. Furthermore, it is not clear whether the crisis intervention specialist with whom J.J. disclosed the abuse was a licensed psychologist subject to R.C. 2317.02 or 4732.19. Accordingly, I would find that the trial court erred as a matter of law when it denied Kelley's request for the court to conduct an in camera review of the relevant records.

{¶ 102} In conclusion, I dissent on the majority's resolution of the first assignment of error. The trial court should have conducted an evidentiary hearing to determine if the subpoena was unreasonable or oppressive under the *Nixon* test. Additionally, upon finding the records material, the trial court should have conducted an in camera review of records subject to any claims of privilege. Accordingly, I would sustain Kelley's first assignment of error. I concur with the remainder of the majority's opinion.